UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
SOUTHERN DIVISION

Case No. 98-353-CR-MIDDLEBROOKS/BROWN

UNITED STATES OF AMERICA          :

vs.                               :

CALVIN GRIGSBY, CARMEN            :
LUNETTA, and NEAL HARRINGTON
_____   :

# DEFENDANT CALVIN GRIGSBY'S MEMORANDUM IN
# SUPPORT OF MOTION FOR JUDGMENT OF ACQUITTAL

Albert J. Krieger, Esq.
(Fla. Bar #209422)
ALBERT J. KRIEGER, P.A.
1899 South Bayshore Drive
Miami, Florida 33133
(305) 854-0050
Fax (305) 285-1761

Scott A. Srebnick, Esq.
(Fla. Bar #872910)
1899 South Bayshore Drive
Miami, Florida 33133
(305) 285-9019
Fax (305) 285-1761

Theodore V. Wells, Jr., Esq.
LOWENSTEIN, SANDLER, KOHL, et al.
65 Livingston Avenue
Roseland, New Jersey 07068
(973) 992-8700



## TABLE OF CONTENTS

STATEMENT OF THE FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

   The Commercial Contract Relationship . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

   The Course Of Dealings And Conduct Of The Parties . . . . . . . . . . . . . . . . . . . 8

   The Superseding Indictment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

   I.    THE ALLEGED VIOLATIONS OF 18 U.S.C. §666 . . . . . . . . . . . . . . 12

       A.   Calvin Grigsby Is Not An "Agent" Of Dade County . . . . . . . . . . . 16

       B.   The Unambiguous Language Of The Contract Proves
           That Fiscal Operations "Owned" The Crane User Fees . . . . . . . . 28

       C.   The Course Of Dealings And Conduct Of The Parties,
           Even If Relevant, Proves That, Under The Contract,
           Fiscal Operations "Owned" The Crane User Fees . . . . . . . . . . . . 45

       D.   An Ambiguous Contract Cannot Form The Basis For
           A Criminal Prosecution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

       E.   Calvin Grigsby's Belief That Fiscal Operations
           Owned The Crane User Fees Is A Complete Defense . . . . . . . . . . 49

       F.   Both The County's Authorization Of The Operating
           Agreement And Its Consent To Fiscal Operations'
           Budget And Expenditures Are Complete Defenses . . . . . . . . . . . 52

       G.   The Management Fee Constitutes A "Bona Fide" Fee
           In The Usual Course Of Business Under 18 U.S.C. §666(c) . . . . 54

       H.   There Is No Federal Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . 57

       I.    Due Process And The Rule Of Lenity Require Dismissal . . . . . . . 67

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

## INTRODUCTION

Defendant CALVIN GRIGSBY, by and through undersigned counsel, and pursuant to Fed.R.Crim.P. 29(a), respectfully moves the Court for an Order granting him a judgment of acquittal on all counts of the Superseding Indictment.  In support of this motion, Mr. Grigsby submits the following statement of facts and memorandum of law.

## STATEMENT OF THE FACTS

At all times, Defendant Calvin Grigsby was the controlling stockholder of Fiscal Funding Co., Inc., the parent of Fiscal Operations, a private, for-profit California corporation that operated and maintained the gantry cranes at the Port of Miami in Dade County, Florida, and billed and collected hourly charges from private companies that rented those cranes to load and unload cargo.  Defendant Carmen Lunetta was the Director of the Port of Miami.  Defendant Neal Harrington, through Harrington & Co., was a part-owner of a company named Continental Stevedoring & Terminals, Inc., which loaded and unloaded cargo to and from ocean-going vessels, using the cranes maintained and operated by Fiscal Operations.

### The Commercial Contract Relationship

At all times, the relationship between Fiscal Operations and Dade County was governed by a purely commercial arms-length agreement approved by the Board of County Commissioners by Ordinance.  The original Operating Agreement was approved in 1982 (hereinafter "the 1982 Contract").  At the time the 1982 Contract was executed, the beneficial use of the first two gantry cranes was acquired by Fiscal Operations from Walter Heller & Co. under a leverage lease arrangement whereby the lease payments were secured by

-1-

revenues to be generated from the use of the cranes after payment of operating costs.  Tr. 4/28/99, at 100-180.

The 1982 Contract provided that "[d]uring the term of this Operating Agreement, [Fiscal Operations] shall have the right and responsibility to provide heavy lift gantry crane rental services to stevedore companies which engage in unloading and loading vessels at the Seaport Properties." 1982 Contract, at ¶5.  The 1982 Contract provided that "it is the intent of the parties that the County shall not have any right to possession of the [cranes] or to operate or maintain such [cranes], or to control such operations or maintenance..."  1982 Contract, at ¶12.  Significantly, the 1982 Contract also expressly provided that the County did not own the crane user fees: "[the county] shall not participate in any revenues ... earned by [Fiscal Operations] from the performance of gantry crane rental services or for any other services rendered by [Fiscal Operations] to its customers."  1982 Contract, at  ¶13.

The 1982 Contract was restated and amended in 1988 in connection with the purchase of the first two gantry cranes by Dade County from Walter Heller & Co., and the construction of three additional cranes.  The 1988 Restated and Amended Operating Agreement (hereinafter the "Operating Agreement") continued Fiscal Operations' franchise to operate a private business providing "heavy lift gantry crane rental services to stevedore companies which engage in unloading and loading vessels within the Port."  Operating Agreement, at Whereas Clause 2 and ¶5.  The Operating Agreement provided that "[t]he County hereby hires [Fiscal Operations] as an independent contractor and not as an employee, agent, partner or joint venturer of the County, to perform the duties set forth

-2-

herein..." Operating Agreement, at ¶5.  The Operating Agreement provided that Fiscal Operations, "as agent of the County, shall collect (promptly and in a commercially reasonable manner) on the County's behalf, all fees derived from users..."  Operating Agreement, at ¶13. The Operating Agreement provided that Fiscal Operations shall "*retain* from User Fees collected pursuant to Section 13 hereof (i) the Management Fee ... and (ii) the Excess Usage Fee, if any...," Operating Agreement, at ¶5 (emphasis added) and, at prescribed intervals, "*pay to the County* any and all User Fees in excess of the amounts retained by [Fiscal Operations] as provided in this Agreement." Operating Agreement, at ¶13 (emphasis added).

The Management Fee "shall mean for any Calculation Period, including without limitation the first such Calculation Period during the term of this Agreement, *an amount not less than* either (i) *the total Annual Budget for such fiscal year* (which shall include a general administrative charge of not less than $100,000) divided by 12, which amount is deemed by the Operating Company and the County to be sufficient to pay all costs and expenses incurred by the Operating Company in the performance of its duties and obligations hereunder (other than Extraordinary Expenses) during such Calculation Period in full, or (ii) such other amount as the County and the Operating Company may mutually agree upon from time to time."  Operating Agreement, at Exhibit B, Definitions (emphasis added).  The Operating Agreement provides that Fiscal Operations is required to submit to the County its "operating and maintenance budget ... in the form of Exhibit C-2 attached hereto." Operating Agreement, at ¶5. Exhibit C-2 includes operating expenses *plus* salaries and fringe benefits,

general and administrative expenses, and other items not directly related to crane operations.

For reasons that will become even more obvious, *infra*, it is important to note the provisions that are ***not*** contained within the Operating Agreement. The Operating Agreement contains no provision that the crane user fees are the property of Dade County. The Operating Agreement contains no provision that requires Fiscal Operations to deposit the crane user fees in a bank account, much less a County-designated depository. The Operating Agreement contains no provision that requires Fiscal Operations to hold the crane user fees in trust for Dade County. The Operating Agreement contains no provision that requires Fiscal Operations to segregate the crane user fees from other funds. The Operating Agreement contains no provision that makes the entirety of the crane user fees collected available to Dade County upon demand. The Operating Agreement contains no provision that restricts the right of Fiscal Operations to commingle the crane user fees in its bank account with money deposited from other sources. The Operating Agreement contains no provision restricting how Fiscal Operations could spend the crane user fees in its bank account. The Operating Agreement contains no provision that requires Fiscal Operations to obtain "authorization" from Dade County, or anyone else, before making a particular expenditure from crane user fees.

Specific laws and regulations govern the treatment of "County money" and the processing of budgets of itemized appropriations for the expenditure of County money. Article VIII, Section 1(b) of the Florida Constitution provides that "[t]he care, custody and method of disbursing county funds shall be provided by general law." Section 136.03 of the Florida

-4-

Statutes provides that all persons "having, receiving, or collecting any money" payable to the County shall deposit the funds into qualified depositories. Yet, nothing in the Operating Agreement required Fiscal Operations to deposit the crane user fees into a qualified depository. Section 219.02(2) of the Florida Statutes provides that "all public money shall be kept separate in the depository and shall not be commingled with personal funds." Yet, nothing in the Operating Agreement required Fiscal Operations to segregate the crane user fees from any other funds or deposit them in a county depository.

Section 129.03(3)(a) of the Florida Statutes requires the board of county commissioners to receive and examine the tentative budget for each fund containing public money. Yet, nothing in the Operating Agreement required receipt or examination of Fiscal Operations' budget by the county commission. Section 129.03(3)(c) requires the board of county commissioners to hold public hearings to adopt tentative and final budgets regulating the expenditures of county funds. Yet, the Operating Agreement establishes the Port Director as the County Representative to whom authority is delegated to approve the Fiscal Operations budget, and nothing in the Operating Agreement requires a public hearing regarding the budget for the expenditure of crane user fees. Section 129.03(3)(c) of the Florida Statutes requires that "tentative budgets, adopted tentative budgets, and final budgets shall be filed in the office of the county auditor as a public record." Yet, nothing in the Operating Agreement required Fiscal Operations to file its budget in the office of the county auditor. If an amendment to a budget for the expenditure of county funds is required for a particular purpose, "the amendment may be authorized by resolution or ordinance of the board of county commissioners adopted following a public hearing." Fla. Stat. 129.06(f). Yet, nothing in the Operating Agreement required a public hearing before amendment

-5-

of the Fiscal Operations' budget.

Finally, under the Operating Agreement, Fiscal Operations bears the risk of expenditures exceeding revenues. Unlike the 1982 Contract, the Operating Agreement makes no provision for operating advances by Dade County should Fiscal Operations suffer a revenue shortfall. Thus, the Operating Agreement was, as a matter of law, not a "cost-plus" contract. *Burditt v. Sisk*, 710 S.W. 2d 114, 118 (Tex. Ct. App. 1986):

> A "cost-plus" contract is one in which "the contractor is to be reimbursed for costs of materials and labor by the owner and is to receive a stated percentage of such costs as his profit." The consideration due to a contractor under a "cost-plus" contract can not be ascertained other than by relation to costs expended or necessary to be expended. [citations omitted]

*Id.*

The elements of a cost-plus contract are well established -- the contract must provide that all costs of performance be borne by the "owner" and that the "contractor" will receive a guaranteed profit, measured as a percentage of the costs of performance. *See Hughes Aircraft Co. v. United States*, 520 U.S. 939, 942 (1997) (cost-plus contract entitles contractor to be reimbursed for all costs incurred and to receive a reasonable profit); *South Motor Co. of Dade County v. Accountable Constr. Co.*, 707 So. 2d 909, 910-912 (Fla. 3d DCA 1998) (cost-plus contract entitled contractor to receive actual costs plus ten percent overhead and ten percent profit); *Robert A. Huggins Gen. Contractor, Inc. v. N.B. Willoughby*, 595 So. 2d 1003, 1004 (Fla. 5th DCA 1992) (agreement not cost-plus contract because contractor was not entitled to "a designated percentage for profit over and above his costs."); *Myrick v.*

*Miller*, 256 So. 2d 255, 256 (Fla. 3d DCA 1971) (cost-plus contract provides contractor with guaranteed profit). In sharp contrast to the cost-plus contracts discussed in these cases, the Operating Agreement neither entitles Fiscal Operations to ***reimbursement*** for its actual expenses from Dade County nor entitles Fiscal Operations to a guaranteed profit, measured as a percentage of actual expenditures incurred. Rather, the Operating Agreement provides that the agreed-upon "Management Fee" shall be an "amount [] ***deemed*** ... sufficient to pay all costs and expenses incurred by the Operating Company...***in full***..." Operating Agreement, at Exhibit B, Definitions (emphasis added). Although the Operating Agreement permits the parties to agree upon an adjustment to the "Management Fee" over the course of a fiscal year, nothing in the Operating Agreement requires Dade County to reach such an agreement. Thus, the Operating Agreement contemplates a classic fixed-price contract arrangement, with no regard to actual costs, and with Fiscal Operations bearing the risk of an unexpected revenue shortfall or cost inflation.

Moreover, unlike a "cost-plus" contract, the Operating Agreement does not guarantee Fiscal Operations a "plus" or "profit." The $100,000+ administrative charge, which is expressly provided to be ***included*** in the "Management Fee," but which the government has repeatedly, and erroneously, concluded is the entire "Management Fee" or profit to Fiscal Operations, is nothing more than a management payment to Fiscal Funding, which constitutes "income to Fiscal Funding and expense to Fiscal Operations." Tr. 4/29/99, at 35 (Crowe-Direct). An expense is not a profit. To be sure, under any scenario, that administrative charge cannot be viewed as the "plus" or "profit" to Fiscal Operations because a "profit" assumes that the payment

-7-

of all costs is guaranteed -- an assumption not applicable here.

### The Course Of Dealing And Conduct Of The Parties

As required under the contract, Fiscal Operations operated and maintained the gantry cranes and provided heavy lift gantry crane rental services to stevedore companies. Employees of Fiscal Operations recorded the amount of usage time on rental vouchers and generated an invoice on Fiscal Operations' letterhead. Tr. 4/29/99, at 131-32, 176-78. That invoice was sent to the stevedore companies. Tr. 4/29/99, at 179. The stevedore companies, in turn, made checks for the amount of the invoice payable to Fiscal Operations. Tr. 4/29/99, at 179. Beginning in 1988-89, when Fiscal Operations moved its books and records to San Francisco, those checks were mailed to the Fiscal Operations main office in San Francisco. Tr. 4/29/99, at 179. Employees of Fiscal Operations deposited those checks in Fiscal Operations' own private bank account in California, first at Security-Pacific and then at Bank of America. Tr. 4/29/99, at 65.

The Fiscal Operations bank account in San Francisco was not a designated trust account for Dade County. Tr. 4/29/99, at 70-73; Tr. 5/6/99, at 181-184. The Fiscal Operations bank account did not list Dade County as a beneficiary of the account. Tr. 5/6/99, at 181-82. No official or employee of Dade County had legal authority to sign checks on the Fiscal Operations bank account. Tr. 5/6/99, at 181-82. No official or employee of Dade County had legal authority to withdraw money from the Fiscal Operations bank account. Tr. 5/6/99, at 181-82. Fiscal Operations paid operating expenses out of that account and commingled money from other sources into that account, including periodic reimbursements and a $540,627.85 payment from Walter Heller & Co., in or about 1989. Tr. 5/11/99, at 228-232; Tr. 5/20/99, at 112-114. When the Operating Agreement went into effect on November 1, 1988, Fiscal Operations had

-8-

more than $1 million in cash and accounts receivables -- to which Dade County had absolutely no claim under the 1982 Contract.

Accountant Bob Crowe, a government witness, prepared (and Mr. Grigsby signed), the corporate tax returns for Fiscal Funding Co., Inc., for every year of its existence. Tr. 4/29/99, at 48-53; GX 247(a)-(f). Those tax returns contained the schedule for Fiscal Operations. Tr. 4/29/99, at 58. Prior to preparing the tax returns for the years 1982-88, accountant Crowe became familiar with the 1982 Contract. Tr. 4/29/99, at 13. Prior to preparing the tax returns from 1989-96, accountant Crowe had read the 1988 Operating Agreement. Tr. 4/29/99, at 13, 52. Based on accountant Crowe's understanding of the contracts, Fiscal Operations reported *all* of the crane user fees as its own revenue on its corporate tax returns and financial statements for every year from 1982 through 1998. Tr. 4/29/99, at 48-49, 72-73. Fiscal Operations did not report on its tax returns that any money was being held in trust for Dade County. Tr. 4/29/99, at 70-72. According to accountant Crowe, the Internal Revenue Service agents who reviewed Fiscal Operations' reporting practices had read the contracts and did not dispute Fiscal Operations' reporting of the crane user fees as its own. Tr. 4/29/99, at 92-96.

Dade County did not report the gross crane user fees as revenue of Dade County on its financial statements but, rather, only reported the net amount (cash) paid to the County by Fiscal Operations. Tr. 4/29/99, at 110. According to accountant Crowe, the amount due to Dade County was the amount in excess of the budgeted expenses. Tr. 4/29/99, at 21. On occasion, the County submitted a bill to Fiscal Operations for the net amount owed. The bill even contained a provision requiring payment of interest for any late payments.

Carmen Lunetta, as Port Director, controlled the tariff and, consequently, the rates

charged to stevedore companies for using the gantry cranes.  Mr. Lunetta often requested or directed that credits be granted by Fiscal Operations to stevedore companies for user fees owed to Fiscal Operations.  Mr. Lunetta directed Fiscal Operations to allow stevedore companies who had not paid their bills to nonetheless use the gantry cranes, against the wishes of Fiscal Operations' employees.

Mr. Lunetta requested Fiscal Operations and/or its employees to, among other things: **1)** make political and charitable contributions, Tr. 4/29/99, at 246; 4/30/99, at 68-69; Tr. 5/13/99, at 145-55; **2)** sponsor charity golf tournaments, Tr. 5/4/99, at 68; Tr. 5/13/99, at 162; Tr. 5/25/99, at 259; **3)** pay salaries to employees who did not work for Fiscal Operations, but did work for Dade County, Tr. 4/29/99, at 139; Tr. 5/6/99, at 50-51; Tr. 5/10/99, at 60-68, 114; Tr. 5/20/99, at 194; **4)** lease a vehicle for Lunetta, Tr. 4/29/99, at 168; Tr. 4/30/99, at 119; and **5)** pay for computer equipment for the Port of Miami, Tr. 5/19/99, at 38; Tr. 5/21/99, at 177.

Mr. Lunetta persuaded Frederic Darden to buy Lunetta's house with the financial assistance of a substantial raise from Fiscal Operations and a $75,000 loan from Fiscal Funding. Tr. 5/20/99, at 211-15; Tr. 5/21/99, at 101, 173.  Mr. Darden testified that he was entitled to the raise.  Tr. 5/21/99, at 122.  Mr. Lunetta also directed Fiscal Operations to wire $85,000 to a trust account of a Puerto Rican law firm, for the ultimate benefit of Commissioner Arthur Teele, which Fiscal Operations' accounting personnel and auditors assumed to be a marketing expense approved by the Port Director.  There was no evidence presented that Mr. Grigsby knew that Teele was the beneficiary of the loan or that the expenditure was not a marketing expense.  Tr. 6/1/99.

The government presented evidence that Mr. Grigsby asked Fred Darden and John Tiddes

-10-

to make a $1500 contribution to the campaign of Mayor Richard Daley of Chicago. Tr. 4/30/99, at 69-71, 81; Tr. 5/4/99, at 45; Tr. 5/21/99, at 22. Darden wrote a personal check and reimbursed himself from Fiscal Operations' bank account. Fiscal Operations treated this expense as a cash advance to Fred Darden. The government also presented evidence that Fiscal Operations paid for certain expenditures that, according to the government, were not directly related to the operation of the gantry cranes. These included a payment of $21,624.24 in legal fees to attorney David Millstein for a personal legal matter for Mr. Grigsby, Tr. 5/12/99, at 143-45; three payments related to the maintenance of a boat owned by Fiscal Funding, Tr. 5/14/99, at 11-16, GX-150(A)-(B), GX-72(A) & (C); two payments of dues to Mr. Grigsby's country club, Tr. 5/18/99, at 200-01, GX-65(A)-(C), a payment of $8615.00 for Super Bowl tickets, Tr. 5/18/99, at 201-02, GX-66(A)-(C), three payments for storage of the aforementioned boat, Tr. 5/18/99, at 181-82, GX-59(A)-(E), a $15,000.00 payment for a public relations campaign of community interest to help return the Los Angeles Raiders to Oakland, Tr. 5/12/99, at 149-58, GX-140(A), a $10,000.00 payment to a consulting company assisting Fiscal Operations to obtain additional business in other ports, Tr. 5/13/99, at 120-26, GX-148, and others.[1] The evidence establishes that such expenditures of Fiscal Operations were itemized by category on its tax returns. Records documenting all expenditures were kept on file at Fiscal Operations' office in California.

**The Superseding Indictment**

Count 1 charges that defendants Lunetta and Grigsby engaged in a dual-object conspiracy

---

[1] Indeed, the evidence established that Fiscal Operations actively sought contracts to operate gantry cranes at other ports, including Port Everglades.

-11-

to violate 18 U.S.C. §666(a)(1)(A) by allegedly stealing money that belonged to Dade County pursuant to the contract, and to violate 18 U.S.C. §1956 by allegedly conducting financial transactions with some of the proceeds of that alleged theft, all in violation of 18 U.S.C. §371. Counts 2, 3, 4, 6, and 7 charge defendants Lunetta and Grigsby with substantive violations of 18 U.S.C. §666(a)(1)(A). Count 5 charges defendants Lunetta and Harrington with a substantive violation of 18 U.S.C. §666(a)(1)(A). Counts 8 and 9 charge defendants Lunetta and Grigsby with substantive money laundering offenses, for allegedly engaging in financial transactions with the proceeds of the alleged theft of Dade County money, with the intent to conceal the source or identity of the funds, in violation of 18 U.S.C. §1956(a)(1)(B)(i), to wit: a $1500 check from Darden to "Daley for Mayor" (Count 8) and a $1750 check from Darden to Carmen Lunetta (Count 9). Count 10 charges defendant Lunetta with conducting a financial transaction in excess of $10,000 with the proceeds of the alleged theft, in violation of §1957, to wit: the $85,000 loan to Arthur Teele. Thus, all ten counts of the superseding indictment either charge substantive violations of 18 U.S.C. §666(a)(1)(A), allege §666(a)(1)(A) as the object of the conspiracy, or allege §666(a)(1)(A) as the specified unlawful activity.

## ARGUMENT

### I.  THE ALLEGED VIOLATIONS OF 18 U.S.C. §666

18 U.S.C. §666(a)(1)(A) provides as follows:

(a)  Whoever, if the circumstance described in subsection (b) of this section exists --

    (1)  ***being an agent of an organization, or of a State, local, or Indian tribal government, or any agency thereof*** --

(A)    embezzles, steals, obtains by fraud, or otherwise without authority knowingly converts to the use of any person other than the rightful owner or intentionally misapplies, property that --

    (i)    is valued at $5,000 or more, and

    (ii)    ***is owned by***, or is under the care, custody, or control of such organization, government, or agency...

                   * * *

shall be fined under this title, imprisoned not more than 10 years, or both.

(b)    The circumstance referred to in subsection (a) of this section is that the organization, government, or agency receives, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance.

(c)    This section does not apply to bona fide salary, wages, fees, or other compensation paid, or expenses paid or reimbursed, in the usual course of business.

18 U.S.C. §666 (emphasis added).

Congress enacted Section 666 in 1984 as part of the Comprehensive Crime Control Act of 1984, Pub. L. No. 98-473, Title II, § 1104(a), 98 Stat. 2143, in response to two types of cases. The first were cases where prosecution under the theft of federal property statute, 18 U.S.C. §641,[2] failed because the government could not show that it owned the property

---

[2] In 1984, Section 641 provided, in pertinent part:

Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority, sells, conveys or disposes of any record, voucher, money, or thing of value of the United States or of any department or agency thereof, or any property made or being made under contract for the United States or any department to agency thereof ...

stolen at the time of the theft where such property had been transferred to a state or local government or other organization under a federal program. The second type of case involved prosecutions brought under the federal bribery statute against local and state officials administering federal funds, 18 U.S.C. §201, which failed in many cases because some courts construed Section 201's definition of covered public officials to include only federal officials. The legislative history of Section 666 explains Congress' attempt to close these loopholes:

> [Section 666] is designed to create new offenses to augment the ability of the United States to vindicate significant acts of theft, fraud, and bribery involving Federal monies that are disbursed to private organizations or State and local governments pursuant to a Federal program.

> * * * *

> As indicated, [Section 666] covers both theft and bribery type offenses. With respect to theft, 18 U.S.C. 665 makes theft or embezzlement by an officer of an agency receiving assistance under the Job Training Partnership Act a Federal offense. However, there is no statute of general applicability in this area, and thefts from other organizations or governments receiving Federal financial assistance can be prosecuted under the general theft of Federal property statute, 18 U.S.C. 641, only if it can be shown that the property stolen is property of the United States. In many cases, such prosecution is impossible because title has passed to the recipient before the property is stolen, or the funds are so commingled that the Federal character of the funds cannot be shown. This situation gives rise to a serious gap in the law, since even though title to the monies may have passed, the Federal Government clearly retains a strong interest in assuring the integrity of such program funds. Indeed, a recurring

---

Shall be fined not more than $10,000 or imprisoned not more than ten years, or both; but if the value of such property does not exceed the sum of $100, he shall be fined not more than $1,000 or imprisoned not more than one year, or both.

problem in this area (as well as in the related area of bribery of the administrators of such funds) has been that state and local prosecutors are often unwilling to commit their limited resources to pursue such thefts, deeming the United States the principal party aggrieved.

With respect to bribery, 18 U.S.C. 201 generally punishes corrupt payments to Federal public officials, but there is some doubt as to whether or under what circumstances persons not employed by the Federal Government may be considered as a "public official" under the definition in 18 U.S.C. 201(a) as anyone "acting for or on behalf of the United States, or any department, agency, or branch of Government thereof, including the District of Columbia, in any official function." The courts of appeals have divided on the question whether a person employed by a private organization receiving Federal monies pursuant to a program is a "public official" for purposes of section 201.

S. Rep. No. 98-225, at 369 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3510. "Thus, as is evident from the circumstances surrounding its adoption, §666's manifest purpose is to safeguard finite federal resources from corruption and to police those with control of federal funds." *United States v. Rooney*, 37 F.3d 847, 851 (2d Cir. 1994).

In this case, the government alleges that Miami-Dade County received in excess of $10,000 in federal funds in any given year and, therefore, is a protected organization under the statute. To prove that the defendants violated 18 U.S.C. §666(a)(1)(A) with respect to Miami-Dade County, the government must prove the following facts beyond a reasonable doubt:

First, that the particular defendant was an agent of Dade County;

Second, that the particular defendant knowingly embezzled, stole, obtained by fraud, misapplied, or knowingly and without authority

-15-

> converted to the use of someone other than the rightful owner
> some money;
>
> Third, that at the time of the alleged theft, the money was owned
> by Dade County;
>
> Fourth, that the money had a value of $5,000 or more; and
>
> Fifth, that Dade County, in a one year period, received benefits of
> more than $10,000 under any Federal program involving a grant,
> contract subsidy, loan, guarantee, insurance or other assistance.

Seventh Circuit Federal Jury Instructions, 18 U.S.C. §666(a)(1)(A) (modified).[3]

Mr. Grigsby is entitled to a judgment of acquittal on the counts charging him with violating 18 U.S.C. §666. Mr. Grigsby respectfully submits that the government's theory of the case is both legally and factually deficient.

## A.    Calvin Grigsby Is Not An "Agent" Of Dade County

The first element that the government must prove is that Calvin Grigsby was an agent of Dade County. An "agent" is defined under 18 U.S.C. §666(d)(1) as "a person authorized to act on behalf of another person or a government and, in the case of an organization or government, includes a servant or employee, and a partner, director, officer, manager, and representative." Only a few courts have provided any guidance as to this term should be interpreted, and those cases appear to conflict.

In *United States v. Ferber*, 966 F. Supp. 90, 100 (D. Mass. 1997), the district court

---

[3] In his requested jury instruction on §666, filed May 24, 1999, Mr. Grigsby proposed the additional element of a nexus between the alleged theft and the federal program, so as to avoid a serious constitutional infirmity in the statute as applied to this case. That issue is addressed in Section H of this memorandum.

looked to general principles of agency law to determine whether a financial advisor to several government agencies was an "agent" of those entities for purposes of §666. Specifically, the district court considered the three essential characteristics of an agency relationship, namely: 1) the power of the agent to alter the legal relationships between the principal and third parties and the principal and the agent herself; 2) the right of the principal to control the agent concerning matters within the scope of the agency; and 3) the existence of a fiduciary obligation owed by the agent to the principal with respect to matters within the scope of the agency. The district court concluded that the investment advisor was not an "agent" under §666.

By contrast, in *United States v. Toro*, No. 89 CR. 0268 (RWS), 1989 WL 63118 (S.D.N.Y. 1989), the court rejected use of the common law definition of agent, reasoning that the "express definition" of "agent" provided in subsection (d)(1) "require[d] no further explication." *See* S. Rep. No. 96-225 at 1984 U.S.C.C.A.N. 3511. The court wrote:

> By its own words, therefore, Congress stated its intent to use its own definition of 'agent,' and not to incorporate the definitions already available in the Restatement (Second) of Agency and elsewhere. An independent contractor like Toro falls within that definition .... By retaining Toro to recruit students for its program, the School enlisted her as its representative and authorized her to act on its behalf in that endeavor. Accordingly, she acted as the school's agent and is subject to prosecution under Section 666 for her actions in that capacity.

*Id.* at *2. Thus, the courts are divided on whether a defendant's status as an "agent" should be analyzed by the strict definition used in the statute or by resort to common law principles

of agency. In the final analysis, the distinction is not significant because Mr. Grigsby is not an "agent" of Dade County under either definition.

The statute's general definition of "agent" as a person "authorized to act on behalf of another" is followed by a more specific list, which "*includes* a servant or employee, and a partner, director, officer, manager and representative." (Emphasis added). Although the term "includes" does not, as a matter of statutory construction, limit the definition of "agent" to only those types of persons enumerated in the statute, *see* Sutherland Statutory Construction, at §47.23 ("When 'include' is utilized, it is generally improper to conclude that entities not specifically enumerated are excluded."), the doctrine of *ejusdem generis* requires that any other type of person not specifically included be of the same type as the description contained in the list:

> Where general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words. *Where the opposite sequence is found, i.e., specific words following general ones, the doctrine is equally applicable, and restricts application of the general term to things that are similar to those enumerated.*

*Id.* at §47.17 (emphasis added); *see also Miami Heart Inst. v. Sullivan*, 868 F.2d 410, 413-14 (11th Cir. 1989). Here, the class of persons enumerated is marked by a common characteristic -- a fiduciary-type relationship with the employer or principal.

Mr. Grigsby cannot be viewed as an "agent" of Dade County by reference to the specific examples employed in §666 because he did not occupy a fiduciary role vis-a-vis Dade County similar to that of a servant, employee, partner, director, officer, manager, or representative. Mr. Grigsby owned Fiscal Funding, the parent of Fiscal Operations, which

entered into a commercial contractual relationship with Dade County. He was not on Dade County's payroll. He did not receive employee benefits from Dade County. He was not a public official. Tr. 5/12/99, at 204. Dade County had no power to fire him. The citizenry of Dade County had no power to vote him out of office. Mr. Grigsby owed a fiduciary obligation only to his for-profit company, Fiscal Operations, not to Dade County.[4] Mr. Grigsby's fiduciary obligation to Fiscal Operations required him to negotiate the most favorable and profitable deal for his company. Nor can Mr. Grigsby be characterized as a "representative" -- the characterization relied on by the Court in *Toro* -- of Dade County. The term "representative" is defined in the dictionary as "one who represents another or others" such as "one that represents another as agent, deputy, substitute, or delegate usually being invested with the authority of the principal" and "one that represents a business organization." *Merriam Webster's Collegiate Dictionary* 993 (10th ed. 1993). Black's defines "representative" as "one who represents others or another in a special capacity, as an agent, and term is interchangeable with 'agent'." *Black's Law Dictionary* 1302 (6th ed. 1990). In *Toro,* although the factual discussion is too limited to permit a fair analysis, the defendant was retained by, and had received money from, the Hausman Computer School to recruit students to participate in the school program. Thus, the defendant appeared to have been paid by the School, which had received federal funds, to act as its representative in a fiduciary capacity with respect to the recruitment of students. By contrast, Mr. Grigsby did not represent Dade County. He was not invested with the authority of Dade County. He

_____

[4] Mr. Grigsby's efforts to obtain additional business for Fiscal Operations at competitive ports is consistent with his fiduciary obligation to Fiscal Operations and inconsistent with such an obligation to Dade County.

could not legitimately claim that he was acting for Dade County.

Mr. Grigsby cannot be viewed as an "agent" under the more general definition used in the statute. In an analogous context, the Eleventh Circuit recently interpreted language virtually identical to the "a person authorized to *act on behalf of* another person or a government" definition of "agent" in 18 U.S.C. §666. Specifically, under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §1346(b), an "employee of the Government" is defined to include "officers or employees of any federal agency ... and persons *acting on behalf of* a federal agency in an official capacity." *Means v. United States,* ____ F.3d ____ (11th Cir. May 27, 1999). In interpreting this "acting on behalf of" language, the Eleventh Circuit has adopted the "control test," which depends upon whether "the government controls and supervises the day-to-day activities of the individual." *Means v. United States,* ____ F.3d ____ (11th Cir. May 27, 1999).[5] Using the "control" test, the question of Mr. Grigsby's "agent" status is not even a close call. Dade County had no authority to supervise or control Mr. Grigsby's daily activities.

Even assuming that the status of "agent" could theoretically be imputed to Mr. Grigsby through Fiscal Operations, the evidence is nonetheless insufficient because Fiscal Operations is not an agent of Dade County under 18 U.S.C. §666. Paragraph 5 of the Operating Agreement specifically provides that Dade County hires Fiscal Operations "as an independent contractor and *not* as an employee, *agent*, partner or joint venturer of the

---

[5] The principle that statutory waivers of sovereign immunity under the FTCA "are to be construed strictly in favor of the sovereign," *Means,* ____ F.3d at ____ (*quoting McMahon v United States,* 342 U.S. 25, 27 (1951)), does not affect the application of the "control" test to 18 U.S.C. §666 because criminal statutes are similarly to be construed strictly in favor of the accused. *United States v. Lanier,* 520 U.S. 259, 266 (1997).

County, to perform the duties set forth herein..."   As an "independent contractor" hired to provide services to stevedores, Fiscal Operations was acting on its own behalf as a principal. Under the Operating Agreement, Dade County had no right to supervise or control Fiscal Operations in the performance of its duties.  Dade County had no right to control how Fiscal Operations should operate and maintain the cranes.  Dade County had no right to hire or approve employees working directly for Fiscal Operations.  Pressure wrongfully exerted  to hire a group of temporary employees working for Dade County, under threats of terminating the Operating Agreement, cannot now be viewed as proving that Dade County had the *right* to control Fiscal Operations' internal, day-to-day, employment practices.

Of course, the government relies on paragraph 13 of the Operating Agreement, which contains the phrase "as agent of the County" to describe Fiscal Operations' collection duties:

> The Operating Company, as agent of the County, shall collect *(promptly and in a commercially reasonable manner)* on the County's behalf all fees derived from users, as established by the County in accordance with all applicable rules, regulations and tariffs, of the Project or any portion thereof ("User Fees").  The Operating Company shall perform such duties *to the best of its ability and with due skill, care and diligence but at least in accordance with normal debt collection industry standards...*

(Emphasis added).  Reliance on paragraph 13 is unavailing.  First, labels that do not accurately depict the relationship established by a contract have no legal effect on the contract, *see Matter of Carolin Paxson Advertising, Inc.*, 938 F.2d 595, 599 (5th Cir. 1991) (description of advertising agency as "agent for collection purposes" was irrelevant because television and radio stations "had no control over the method by which collection was accomplished."); *In Re Morales Travel Agency*, 667 F.2d 1069, 1071 (1st Cir. 1981) (use of word "trust" in travel agency agreement had no effect absent provision requiring agent to

hold funds in trust by keeping them separate), much less on the determination of whether a party is an agent for purposes of 18 U.S.C. §666. Second, Fiscal Operations clearly was not a traditional collection agent which serves no function other than to collect a debt owed by a third party to a principal. Fiscal Operations performed numerous duties under the Operating Agreement, not the least of which was to operate and maintain the gantry cranes as an independent contractor, and to pay all expenses associated with operating and maintaining the cranes. Unlike a traditional "collection agent," Fiscal Operations collected user fees that were owed *to itself*, not some other principal.

Third, and perhaps most important, Dade County had no right under the Operating Agreement to control the manner and method by which Fiscal Operations undertook to collect the crane user fees from the stevedore companies. "[I]t is the *right* to control, not the actual exercise of control, that is significant." *See N.L.R.B. v. Associated Diamond Cabs, Inc.*, 702 F.2d 912, 920 (11th Cir. 1983). Fiscal Operations' obligation was governed solely by the terms of the Operating Agreement, which required Fiscal Operations to collect crane user fees in a commercially reasonable manner in accordance with normal debt collection industry standards, not in accordance with any instructions by Dade County. In other words, Fiscal Operations had to use its own diligence and care. Nothing in paragraph 13 gave Dade County the right to control or change the manner in which Fiscal Operations was required to collect the crane user fees. To be sure, the "collection agent" language in paragraph 13 was a device "merely to ensure the debtor's performance of its obligation." *In re Morales Travel Agency*, 667 F.2d at 1071; *In re Koelfgen*, 87 B.R. 993, 997 (Bankr. D.Minn. 1988) ("The contractual language in which Koelfgen agreed to 'immediately remit to the Company

-22-

all premiums collected by the Agent of Sub-agents in excess of the Agent's initial commission thereon' is nothing more than a collection device for UAI.").

The Fifth Circuit recently analyzed the "control" test in the context of a conventional debt collection agency. *Morante v. American Gen. Fin. Ctr.*, 157 F.3d 1006, 1009 (5th Cir. 1998). The collection agency (CSI) had entered into a contract with another private company (AGFC) to collect certain debts that were owed to that company. The question facing the court was whether CSI was the "agent" of AGFC and, therefore, liable for CSI's unlawful debt collection practices. *Id.* at 1008-09. The Court held that there was sufficient evidence for the jury to find that CSI was, in fact, the "agent" of AGFC because AGFC "retained numerous rights to control CSI's collection efforts on AGFC accounts." *Id.* at 1009. The Fifth Circuit observed that the contract required CSI to 1) contact the debtor within 24 hours of receiving the account; 2) thereafter make a minimum number of contacts with debtors, 3) have CSI supervisors review AGFC accounts monthly; and 4) report CSI payments weekly; 5) provide AGFC with a complete list of all accounts and their current status upon seven days' notice. *Id.* The contract also set out specific guidelines to determine whether an account was closed, such as: 1) six unsuccessful contacts during different times of the day or week; 2) three "neighbor" contacts to update debtor location information; 3) contact with credit bureaus, employers, and motor vehicle registration; or 4) the account has had no payment activity for three months and is not in litigation. ***Moreover, the contract "required approval by AGFC for settlement or compromise of a claim, and it prohibited CSI from instituting a civil suit on any AGFC account without AGFC's express written authorization."*** *Id.* at 1009-1010 (emphasis added). Once authorization was given, CSI was

required to proceed with legal action within seven days. *Id.* at 1010.

The debt collection agency contract described in *Morante* evinces the type of daily supervision and control inherent in the principal/agency relationship. It contrasts so sharply with the Operating Agreement as to defy comparison. Fiscal Operations had a general obligation not to be negligent in the collection of user fees. Fiscal Operations had no specific obligation to contact the debtor within 24 hours or the debt accruing. Fiscal Operations had no specific obligation to make a minimum number of contacts with debtors. Fiscal Operations had no specific obligation to have its supervisors review stevedore accounts monthly. Fiscal Operations had no specific obligation to report to the County when it received payment from a stevedore company. Fiscal Operations had no specific obligation to provide Dade County with a complete list of all accounts and their current status upon seven days' notice. The Operating Agreement did not set forth specific guidelines to determine whether an account could be closed. The Operating Agreement did not require Fiscal Operations to obtain County approval for settlement of a crane user debt. Witness Charles Triana testified that Fiscal Operations gave credits in the ordinary course of business. The Operating Agreement did not require Fiscal Operations to obtain County approval before giving credits or initiating a lawsuit. Fiscal Operations collected millions of dollars without any involvement of the County. Stated simply, Dade County had no contractual right to control the day-to-day collection efforts of Fiscal Operations. *See McDonnell v. The Music Stand, Inc.*, 886 P.2d 895 (Kansas 1994) ("While the contract used the term 'agent,' The Music Stand did not have any right to control how Goods would make the collection; nothing in the contract indicates Goods was to follow any certain procedures when collecting

-24-

accounts for The Music Stand.").

The Port Director's actions, on occasion, in preventing Fiscal Operations from denying stevedore companies usage of the cranes for non-payment, does not constitute authority to control the manner of collection. Likewise, the Port Director's authority under the Tariff to control the hourly rental fee rate is not the right (legal or contractual) to control the daily activities of Fiscal Operation regarding the manner and method of collection. He did not have the right to micromanage the method of payment or the amount of interest charged. The fact that the County occasionally used pressure to direct Fiscal Operations to give credits, as with the temporary employees, cannot be construed as the right to control.

The conclusion that Mr. Grigsby is not an "agent" of Dade County is buttressed by the purpose of §666 — to criminalize theft or embezzlement by those who are responsible for administering a federal program or had access to, or control over, local government funds that had been commingled with federal funds. *United States v. Rooney*, 37 F.3d 847, 851 (2d Cir. 1994). Mr. Grigsby never administered a federal program, never had access to federal funds, and never had access to local government funds that had been commingled with federal funds. In fact, all funds collected by Fiscal Operations were purely private funds from stevedore companies who had no privity of contract with Dade County. The scope of §666, however broad, was not meant to cover persons who, in the course of a commercial relationship with such organization or government, fail to pay revenues derived solely from such contractor's efforts under a contract in amounts expected under such contract. That is, §666(a)(1)(A) does not apply to non-agent independent contractors working under a contractual relationship with a local government that have no access to that government's

funds. In fact, in virtually every reported theft prosecution involving a local government under §666, the defendant was an employee or official of the local government.[6]  Mr.

----

[6] *See, e.g., United States v. Yashar*, 166 F.3d 873 (7th Cir. 1999) (city employee stole via ghost payrolling); *United States v. Carrillo*, 1998 WL 778311 (2d Cir. Oct. 30, 1998) (city employee stole city property); *United States v. Wadena*, 152 F.3d 831 (8th Cir. 1998) (Indian government officials stole tribal funds); *United States v. Trost*, 152 F.3d 715 (7th Cir. 1998) (city employee stole city funds); *United States v. Hawkey*, 148 F.3d 920 (8th Cir. 1998) (city sheriff stole sheriffs' department funds); *United States v. Wilkinson*, 124 F.3d 971 (8th Cir. 1997) (tribal chairman stole Bureau of Indian Affairs funds); *United States v. Pemberton*, 121 F.3d 1157 (8th Cir. 1997) (Indian government officials stole government funds); *United States v. Gunby*, 112 F.3d 1493 (11th Cir. 1997) (city employee stole city funds); *United States v. Hammond*, 1997 WL 525370 (6th Cir. Aug. 21, 1997) (city employee billed state for work not performed); *United States v. Miller*, 1997 WL 412549 (9th Cir. July 22, 1997) (sheriff stole currency seized by department); *United States v. Stout*, 1997 WL 124274 (8th Cir. Mar. 20, 1997) (Indian government officials stole government funds); *United States v. DeGiovanni*, 104 F.3d 43 (3d Cir. 1997) (police sergeant stole money illegally seized from suspected drug dealers); *United States v. Delano*, 1995 WL 760420 (2d Cir. Dec. 22, 1995) (city employee diverted labor provided by city contractor to own use); *United States v. Hart*, 70 F.3d 854 (6th Cir. 1995) (police chief stole police funds); *United States v. Brown*, 66 F.3d 124 (6th Cir. 1995) (city employee stole city funds); *United States v. Valentine*, 63 F.3d 459 (6th Cir. 1995) (city employee stole city funds); *United States v. Duran*, 59 F.3d 938 (9th Cir. 1995), *appeal after remand*, 1998 WL 63052 (9th Cir. Feb. 3, 1998) (sheriff stole currency seized by department); *United States v. Nichols*, 40 F.3d 999 (9th Cir. 1994) (deputy sheriff stole currency seized by department); *United States v. Johnson*, 16 F.3d 69 (5th Cir. 1994) (city employee stole city funds); *United States v. Brown*, 1993 WL 503204 (9th Cir. Dec. 8, 1993) (police employees stole currency seized by police department); *United States v. Powe*, 9 F.3d 68 (9th Cir. 1993) (deputy sheriffs stole currency seized by department); *United States v. Narvaez*, 995 F.2d 759 (7th Cir. 1993) (city employees stole city funds); *United States v. Brann*, 990 F.2d 98 (3rd Cir. 1993) (narcotics agent stole money to be used for buys); *United States v. Moeller*, 987 F.2d 1134 (5th Cir. 1993), *appeal after remand*, 80 F.3d 1053 (5th Cir. 1996) (state employee gave sham contract to ghost contractor); *United States v. Urlacher*, 979 F.2d 935 (2d Cir. 1992) (police chief stole police department funds); *United States v. Sanderson*, 966 F.2d 184 (6th Cir. 1992) (sheriff department employee stole materials and labor from department contractor); *United States v. Washington*, 1992 WL 92725 (9th Cir. Apr. 23, 1992) (city employees stole city funds); *United States v. Edgcomb*, 1992 WL 49798 (Mar. 16, 1992) (city employee stole city funds); *United States v. Martin*, 1987 WL 38036 (6th Cir. July. 14, 1987) (school district employees stole district funds); *United States v. Hawkins*, 1987 WL 38037 (6th Cir. July 14, 1987) (same); *United States v. Farley*, 1998 WL 684220 (N.D. Ill. Sept. 11, 1998) (city employee stole via ghost payrolling); *United States v. Abney*, 1998 WL 246636 (N.D. Tex. Jan. 5, 1998) (school district employees stole from school district); *United States v. Forste*, 980 F. Supp. 395 (D. Kan. 1997) (administrator of Kansas Air National Guard student loan repayment program stole from program); *United States v. Madrzyk*, 970 F. Supp. 642 (N.D. Ill. July 17, 1997) (city alderman stole city property); *United States v. Wilson*, 1997 WL 169379 (E.D. Pa. Apr. 3, 1997) (police officers stole illegally seized currency); *United States v. Aponte*, 1996 WL 612839 (E.D. Pa. Oct. 25, 1996) (police officers stole seized currency); *United States v. Grossi*, 1995 WL 571417 (N.D. Ill. Sept. 25, 1995) (town employee stole town funds); *United States v. Hacker*, 883

Grigsby does not fall within the category of persons the theft statute was designed to punish.

The conclusion that Mr. Grigsby is not an agent of Dade County is also buttressed by the legislative history that accompanied the promulgation of subsection (c) to 18 U.S.C. §666 in 1986, which exempts from the purview of the statute bona fide fees and other compensation paid in the usual course of business. The House Report to that amendment stated that "18 U.S.C. §666 prohibits bribery of certain *public officials*, but does not seek to constrain lawful commercial business transactions." H.R. Rep. No. 99-797, at 30 (1986), *reprinted in* 1986 U.S.C.C.A.N. 6153 n.9. Indeed, neither the plain language of the statute nor anything in the legislative history suggests that the statute was intended to apply to non-agent, arms-length independent contractors.

Even if the common law definition of agency is utilized, as it was in *Ferber*, the conclusion remains the same. The first factor identified in *Ferber* was whether the agent had the power to alter the legal relationship between the principal and third parties and the principal and the agent itself. Calvin Grigsby had no power to alter the legal relationship between Dade County and third parties. He had no authority, either actual or apparent, to bind Dade County by contract. He had no authority, either actual or apparent, to rescind any contracts between Dade County and third parties. He had no authority, either actual or apparent, to make any representations about Dade County's financial condition to third parties. The second factor identified in *Ferber* — the power of the principal to control the agent with respect to matters within the scope of the agency — is the functional equivalent

---

F. Supp. 444 (D.S.D. 1994) (tribal official stole tribe funds); *United States v. Hock*, 1990 WL 204241 (E.D. Pa. Dec. 11, 1990) (school district administrator stole from school district).

of the "control" test which, for the reasons discussed above, compels the conclusion that Mr. Grigsby is not an "agent" of Dade County.

Finally, even if there is sufficient evidence from which the jury could conclude that Fiscal Operations is an "agent" of Dade County for purposes of collecting crane user fees, that does not translate into sufficient evidence that Mr. Grigsby is an "agent" of Dade County under 18 U.S.C. §666. The theory of the government's case against Mr. Grigsby is that he inflated the budget and made "unauthorized expenditures," not that he committed, or conspired to commit, any illegal acts in connection with the collection of the crane user fees. No fair reading of the Operating Agreement or the other evidence in the case supports the finding that Mr. Grigsby was an "agent" of Dade County for purposes of negotiating the budget, or that he had any fiduciary duty to Dade County to seek the lowest and most efficient budget possible. He did not have a fiduciary duty to keep costs to a minimum. Mr. Grigsby owned a private company. He had the right to seek and negotiate for the most lucrative fee for his company. Thus, the alleged theft was simply unrelated to Fiscal Operations' alleged duties as a "collection agent."

In sum, there is insufficient evidence from which a reasonable jury could conclude that Mr. Grigsby is an "agent" of Dade County for purposes of 18 U.S.C. §666. Accordingly, he is entitled to a judgment of acquittal on all counts.

## B.     The Unambiguous Language Of The Contract Proves That Fiscal Operations "Owned" The Crane User Fees

Independent of the "agent" requirement, the government must prove that the crane user fees were "owned" by Dade County at the time that they were allegedly stolen. 18

U.S.C. §666(a)(1)(A)(ii). The term "owner" is used commonly to designate the person in whom the title of property rests. *See* Black's Law Dictionary 1105 (6th ed. 1990). This means that the government must prove that Dade County had title to the crane user fees when they were on deposit in the bank account of Fiscal Operations.

Property rights are not created out of the thin air; there must be a recognized source in law for Dade County to claim an ownership interest in the crane user fees collected by Fiscal Operations. *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972) (property rights are "defined by existing rules or understandings that stem from an independent source such as state law."). Since Dade County had no statutory claim to the crane user fees in Fiscal Operations' bank account, the only conceivable way that Dade County could be deemed the "owner" of the crane user fees is through its contractual relationship with Fiscal Operations. As such, it is necessary to look to the Operating Agreement to determine whether it established Dade County's legal ownership of the crane user fees in the private bank account of Fiscal Operations. The answer, under Florida law, is an unambiguous no.[7]

In analyzing the relationship of the parties under Florida law, it is important to consider that Dade County, notwithstanding its status as a municipality or as a recipient of federal funds, has no greater rights as a contracting party than any private entity. Its status as a municipality accords it no deference in the interpretation of the contract. Thus, when construing the Operating Agreement, the Court should view the contractual rights of Dade

---

[7] The Operating Agreement is governed by Florida law. Operating Agreement, at ¶23. In other federal criminal contexts in which a question of "ownership" has arisen, courts have looked to the law of the state governing the contract. *United States v. Lawson*, 925 F.2d 1207 (9th Cir. 1991).

County no differently than the Court would view the rights of Walter Heller & Co., had

Heller still owned the cranes and entered into the same contract with Fiscal Operations.[8]

We start with the undisputed fact that the crane user fees, by agreement of the parties,

were collected by Fiscal Operations for services rendered by Fiscal Operations, and that

those fees were deposited in Fiscal Operations' private bank account. "As a general rule ...

one cannot steal his own goods." *Hinkle v. State*, 355 So. 2d 465, 467 (Fla. 3d DCA 1978).

Thus, in *Hinkle*, the Third District Court of Appeal reversed the conviction of a defendant

who was convicted of larceny for withdrawing certificates of deposit from bank accounts that

he shared with his girlfriend as joint tenants with right of survivorship. The court so held,

even though the defendant's girlfriend had contributed all of the certificates of deposits into

the bank accounts and never intended to make a gift of the money to the defendant. The

court reasoned that "[f]or criminal liability purposes, she had no special property right in

these certificates superior to the defendant and possessed no legal right to withhold the

monies therein from him." *Id.*

This principle was applied again in *Rosen v. Marlin*, 486 So. 2d 623 (Fla. 3d DCA

1986). There, two parties (Rosen and Marlin) entered into a joint venture to develop a

shopping center. *Id.* at 624. When they sold the shopping center, the proceeds of the sale

were deposited into Rosen's bank account with Marlin's consent. *Id.* Rosen continued to

make payments on a still-existing mortgage and remit half of the balance to Marlin. *Id.*

Marlin eventually filed a civil theft lawsuit against Rosen claiming that Rosen had withheld

---

[8] The payment to the County of the excess over the Management Fee is not materially different than a percentage of gross lease arrangement.

certain monies due under the partnership agreement. The Third District held that there was no theft of any money as a matter of law because Marlin had consented to Rosen taking control of the money, and Rosen's refusal to pay monies due and owing in accordance with the partnership agreement does not constitute theft or conversion. *Id.* at 625. The court distinguished this case from "a case where a party intentionally received a specifically identifiable sum of money knowing that he had no right to take it and who refused to give it back..." *Id.* at 625. The court also noted that "[t]his is not a case where a party refused to pay over to the demanding party a specific fund capable of separate identification required to be deposited into a special account..." *Id.* at 626; *see also Gambolati v. Sarkisian*, 622 So. 2d 47 (Fla. 4th DCA 1993) (holding that horse trainer who withdrew horse owner's share of winnings from joint bank accounts, in contravention of agreement trainer had with owner, did not commit civil theft because the money owed to the owner was not segregated from the portion of the purse money belonging to the trainer); *Kahlenberg v. State*, 404 So. 2d 1135 (Fla. 4th DCA 1981) (sole owner of corporation who used corporate funds to pay "unauthorized" personal expenses, thereby depleting corporate assets to the detriment of creditors, could not be guilty of grand larceny; creditor fraud is not the equivalent of theft or embezzlement); *Belford Trucking Co., Inc., v. Zagar*, 243 So. 2d 646, 648 (Fla. 4th DCA 1970) ("Therefore, where the parties have an open account, and the defendant is not required to pay the plaintiff identical moneys which he collected, there can be no action in tort for conversion.").

In *Rosen v. Marlin*, the Third District Court of Appeal cited with approval the Eleventh Circuit's decision in *Advanced Surgical Technologies, Inc., v. Automated*

*Instruments, Inc.,* 777 F.2d 1504 (11th Cir. 1985). There, the plaintiff (Advanced) was a Delaware corporation that marketed the Sharplan Laser, a highly sophisticated piece of surgical equipment. *Id.* at 1505. The defendant (Automated), a Florida corporation, was Advanced's exclusive distributor for the Sharplan Laser in Florida. *Id.* In 1981, the parties entered into a formal contract to terminate Automated's exclusive distributorship. At the time, Automated had two lasers in its inventory. Pursuant to that contract, Advanced agreed to sell Automated's two remaining lasers for $47,850.00 each, before it sold any other Sharplan lasers in Florida. The parties further agreed that the purchaser of the first laser would make payment directly to Automated, which would keep $37,000.00 and forward $10,850.00 to Advanced. The purchaser of the second laser would make payment to Advanced, which would then send $35,100.00 to Automated. *Id.* Advanced sold the first laser, but the purchaser paid Advanced rather than Automated and Advanced never paid Automated the $37,000.00 that Automated was due under the contract. *Id.* Advanced breached the contract again when it sold numerous other Sharplan lasers without selling Automated's second laser, thus depriving Automated of the potential $35,100.00 payment from the sale of Automated's second laser. *Id.*

Automated sued Advanced for damages. After a non-jury trial, the federal district judge concluded that Advanced breached the contract and that Automated had incurred $72,100.00 in damages. The district judge also concluded that Advanced's actions amounted to civil theft and conversion under Florida law, and trebled the damages. *Id.* at 1506. The Eleventh Circuit reversed, reasoning as follows:

> ***Automated's claim to any proceeds generated by the sale of the lasers arose***

> *from its contract with Advanced. Advanced's failure to abide by that contract constituted a breach entitling Automated to compensatory damages; it did not constitute theft ...*
>
> As we have said, we view the facts of this case as establishing an ordinary breach of contract. Without holding that a breach of contract could never give rise to a conversion of property claim, we find that Advanced's actions in this case did not constitute a conversion of Automated's property. Advanced did have possession of monies which were generated from the sales of two lasers, and under the contract it *owed* a portion of such proceeds to Automated. However, "a mere obligation to pay money, generally, may not be enforced by a conversion action."

*Id.* at 1507 (emphasis added) (footnote omitted) (citations omitted); *see also Burger King Corp. v. Austin*, 805 F.Supp. 1007, 1012 (S.D.Fla. 1992) (holding that Burger King's failure to expend funds it collected from franchisee on advertising did not state a claim for conversion because allegations were based solely on obligations contained in the franchise agreement).

In *Advanced Surgical*, as here, two parties entered into an arms-length contract pursuant to which one party was allegedly responsible for collecting revenues under the contract and paying the other party a certain portion of those revenues. In *Advanced Surgical*, as here, the party collecting the revenues allegedly acquired possession of the funds allegedly owed to the other under the contract. In *Advanced Surgical*, as here, the party in possession of the funds allegedly failed to pay a portion of those funds to the other party, as required, instead, allegedly spending those funds for its own purposes. In neither situation, however, was the money in the possession of the alleged thief legally *owned by* the allegedly aggrieved party. Rather, money was *owed to* the allegedly aggrieved party.

The overriding principle is that a person cannot be guilty of theft for spending or

withdrawing money from his own bank account, even if the money was collected for and is *owed* to another under a contract. This principle has led to the dismissal of indictments in the context of a similar federal theft statute. For example, in *United States v. Mason*, 218 U.S. 517 (1910), the Supreme Court held that a federal district court clerk was not guilty of embezzling government funds. At the time, the clerk was permitted to collect fees payable to that office and to obtain a portion of his salary from such funds. *Id.* at 523. Twice each year an accounting was to be made and any surplus over and above what he was permitted to retain was paid to the treasury. *Id.* The clerk did not remit the excess. The Supreme Court held that the funds that he kept were *not* funds of the United States but were, instead, a *debt* the clerk owed to the United States. *Id.* at 531.

In *United States v. Lawson*, 925 F.2d 1207, 1209-10 (9th Cir. 1991), the defendant owned Lawson & Lawson Auctioneers, a California corporation hired by the Small Business Administration (SBA) to conduct five separate auctions to dispose of property and equipment from businesses that defaulted on loans guaranteed by the SBA. *Id.* at 1209. The contracts between Lawson and the SBA made no mention about who owned the proceeds, but instead required Lawson to conduct the auctions in a commercially reasonable manner. *Id.* at 1209 n.2. In addition to the payment for his commissions and expenses, Lawson received approximately $256,000 in proceeds from the five auctions. *Id.* at 1209. He failed to remit those proceeds to the SBA, instead using the money to pay expenses from other unrelated auctions. *Id.* at 1209-1210. After Lawson declared bankruptcy, he was indicted for five counts of theft of government property under 18 U.S.C. §641. The district court dismissed the indictment on the ground that the proceeds of the auctions were not government property,

even though the property and equipment which were auctioned to generate the proceeds had belonged to the government.

The Ninth Circuit affirmed the dismissal of the indictment. The court observed that, under California law, an auctioneer could commingle the proceeds from all auctions in one account, and there was no requirement to keep separate trust accounts for proceeds from government auctions. *Id.* at 1209. The court further noted that the auctioneer was "not required to remit the actual proceeds from an auction," but rather, "must remit the *amount* of the proceeds." *Id.* at 1210 (emphasis in original). Finally, the court observed that "California law contains no provision that prevents an auctioneer from using the proceeds of one auction to pay off another, so long as the amount of the proceeds less commission is tendered within thirty days." *Id.* Based on these factors, the court held:

> When a party is allowed to commingle funds and merely is required to pay the amount of net auction proceeds to the seller, *his status is more properly seen as a debtor rather than a bailee.* Unlike the situation prior to the sale, where Lawson was responsible for the actual pieces of property that he held for the SBA, after the auction Lawson could use money from any source, so long as he paid the proper amount.

*Id.* (emphasis added) (citation omitted). *See also United States v. Klingler*, 61 F.3d 1234, 1241 (6th Cir. 1995) (dismissing theft indictment of customs broker who received customs fees from her clients but failed to remit those fees to the Customs Service, even though "the money was specifically earmarked as, and understood by defendant and her clients to be, estimated customs duties that were to be promptly paid to the U.S. Customs Service"); *United States v. Kristofic*, 847 F.2d 1295 (7th Cir. 1988) (reversing conviction under §641 because defendant was a debtor, not a bailee, of funds collected for the benefit of the

government).

Here, as in *Lawson*, there was no requirement that the allegedly stolen revenues be kept in a separate trust account for Dade County. Here, as in *Lawson*, nothing in the contract established that the revenues generated were the property of the government. Here, as in *Lawson*, the contract merely created an obligation to pay certain monies collected under the contract within an agreed time. Indeed, this case is even more compelling than *Lawson*. Whereas Lawson was required to remit to the SBA the full amount of the gross proceeds collected from the auctions, Fiscal Operations was only required to pay Dade County an amount net of certain expenses pursuant to a formula that established a debt, not ownership. Whereas the funds at issue in *Lawson* were derived from the sale of government property, the crane user fees at issue here were collected from private stevedore companies that used the cranes.

The government attempts to avoid the well-settled doctrine in these cases by contending that, under paragraph 13 of the Operating Agreement, Fiscal Operations, "as agent of the County," was required to collect the crane user fees "on the County's behalf." The government suggests that this language alone is sufficient to create an *exclusive* ownership interest by the County in the crane user fees, if it even creates an ownership interest at all.[9] Even assuming that Fiscal Operations occupies the status of "agent" of Dade County for purposes of collecting the crane user fees -- an assumption in dispute -- the

---

[9] Of course, if all that is created is a joint ownership interest with Fiscal Operations, then there can be no theft. *See Hinkle, supra* (joint owner of bank account cannot be guilty of theft for withdrawing money from that account).

government is demonstrably wrong.

The Restatement (Second) of Agency recognizes that a collection agent may treat the money it collects in one of two ways: 1) as the money of the principal held in trust, or 2) as the money of the agent commingled with other funds. *See* Restatement (Second) of Agency, at §72 (Comment "e") ("In many cases, by commercial usage or agreement, the collecting agent is authorized to make himself a *debtor* of the amount collected ...") (emphasis added); §398 (Comment "c") ("In the case of certain professional agents, such as auctioneers and factors, it is customary, and hence ordinarily understood, that the agent can properly mingle his funds with those of his principal .... If the funds are properly mingled, the inference is that the agent becomes a *debtor* to the amount received for the principal...") (emphasis added); §427 (Comment "a") ("It may be understood that an agent who has collected money becomes a debtor to the principal for the amount collected (see §398), in which case he is not liable for the profits made by its use."). Thus, the mere description of an entity as a "collection agent" is not dispositive of the legal ownership of money collected by the agent. Rather, it only begs the further inquiry: what type of "collection agent" relationship was contemplated by the Operating Agreement.

Courts that have considered "collection agent" language in contracts have concluded that money collected by an "agent" on behalf of a "principal" is exclusively the property of the "agent" unless the contract expressly creates a "trust" mechanism whereby the agent is required to deposit the money in a segregated account designated for the principal. *In re Morales Travel Agency*, 667 F.2d 1069, 1071-72 (1st Cir. 1981) (holding that money collected by travel agency from sale of airline tickets was not the property of the airline for

purposes of determining airline's priority in bankruptcy proceeding, notwithstanding provision in contract that money collected by travel agency "shall be the property of the Carrier;" contract did not require travel agency to keep proceeds of ticket sales separate from any other funds, nor were any specific restrictions placed upon agency's use of the money); *In the Matter of Dean* 9 B.R. 321, 323-24 (Bankr. M.D. Fla. 1981) (insurance agent did not convert premium payments it was required to collect under contract because premiums were deposited in agent's general operating account, and the contract did not require agent to set up a special trust account for the deposits of premiums collected); *In re Koelfgen,* 87 B.R. 993 (Bankr. D. Minn. 1988) (insurance agent did not commit embezzlement of insurance premiums for purposes of determining whether debts were dischargeable in bankruptcy; contract between insurance agent and insurance company to sell insurance, collect premiums, and remit the net premium to insurance company created a creditor/debtor relationship, not a trust relationship, because contract did not require agent to segregate the funds collected or otherwise hold them in trust); *In re Storms*, 28 B.R. 761, 765 (Bankr. E.D.N.C. 1983) (same).

As explained above, this principle has been consistently applied outside the bankruptcy context as well. *See Mason, supra; Lawson, supra; Rosen, supra; Gambolati, supra; see also Eggert v. Weisz*, 839 F.2d 1261, 1264 (7th Cir. 1988) (no basis for conversion because there was no express trust or agreement to segregate funds); *Cumis Ins. Soc'y, Inc. v. Peters*, 983 F. Supp. 787, 793 (N.D. Ill. 1997) (debt collection agent not liable for conversion of money collected on behalf of insurance company and used for personal expenses because agreement did not require agent to segregate the money collected);

*Rasmussen v. Sports Media Sales, Inc.,* 691 F. Supp. 153, 155 (N.D. Ill. 1988) (finding that revenues collected by the defendant for the plaintiff did not constitute a specifically identifiable fund because the money was not segregated and the defendant was under no duty to do so); *People v. Keeffe,* 405 N.E.2d 1012 (N.Y. 1980) (attorney who holds in a special account proceeds of settlement of personal injury action not guilty of larceny when withdrawals from that account reduced balance to less than the amount to which predecessor attorney was entitled by court order as share of fees; funds were not trust funds for benefit of predecessor attorney); *People v. Yannett,* 401 N.E.2d 410 (N.Y. 1980) (reversing larceny conviction of nursing home operator who failed to refund Medicare monies owed to residents, where money never belonged to the residents, nor was it entrusted to defendant to hold on behalf of residents); *see also State v. Galbreath,* 525 N.W.2d 424 (Iowa 1994) (holding that cash advanced as a down payment on a construction contract becomes property of contractor because it is not held in trust).

The purpose of the segregation principle makes perfect sense in the context of this case. When the parties signed the Operating Agreement as of November 1, 1988, Fiscal Operations had over $1 million in cash and accounts receivables to which the County had absolutely no claim based on the 1982 Contract. Those funds went into Fiscal Operations' bank account and were commingled with crane user fees that were earned and deposited after November 1, 1988. Later, a deposit of $540,000 from Walter Heller & Co. -- to which the County had no claim -- was made into the Fiscal Operations bank account. Tr. 5/11/99, at 228-32; Tr. 5/20/99, at 112-14. When funds are commingled in that manner, it is not possible to determine which funds are being used for particular expenditures, and questions

regarding who owes who and in what amount must be resolved in civil court. Moreover, where, as here, there are no prohibitions on the commingling of funds in this manner, there can be no claim that specific monies owned by a party were unlawfully taken. By contrast, where a contract creates an express trust account for the segregation of funds properly identified as the property of the principal, and there are specific and clear restrictions upon the use of those funds, there is an identifiable res which the "agent" knows he may not use for his own personal purposes.

An express trust is created where the following factors exist: (1) there is a person competent to create the trust, (2) indication of an intention to create the trust, (3) property to which the trust may and does pertain, (4) a definite and complete disposition of that property, (5) a provision, at least by implication, for the office of trustee, although the nomination of a trustee is not essential, and (6) a person capable of holding the equitable interest in the property as beneficiary. *See, e.g., In re Estate of Herskowitz*, 338 So. 2d 210, 212 (Fla. 3d DCA 1976). The intention to create a trust must be manifested with reasonable certainty and may be determined from the express language or by inference from the trust agreement. "[T]o create a trust, there must be sufficient words to evince an intent to create a trust, a definite subject matter, and a certain and ascertained object, or named beneficiary." *In re G & R Builders, Inc.*, 123 B.R. 654, 658 (Bankr. M.D. Fla. 1990). A trust cannot be created unless there is property to which the trust pertains, which cannot be a mere expectancy without right to interest--such as a mere interest in the performance of a contract. The trustee must be limited in authority in that absolute control and power of disposition of trust assets are inconsistent with the conception of a trust. Finally, if the trustee has the power to use the

trust estate to his own benefit, it is merged. *See Harvest v. Craft Constr. Corp.,* 187 So. 2d 72, 74 (Fla. 3d DCA 1966).

The Operating Agreement contains no language creating a trust.[10]  The Operating Agreement did not direct that the fees be segregated or prohibit commingling of such fees with other monies.  Section 13, relied on by the government to suggest a trust, does not state that the revenues in excess of the Management Fee and the Excess Usage Fee retained by Fiscal Operations be "held" for the County, but rather that they be "paid" to the County.[11] Notwithstanding conflicting opinion testimony about the lawful owner of the crane user fees,[12] not a single government witness testified that Fiscal Operations' bank account in California was a trust account in favor of Dade County.  The Operating Agreement contains no provision that makes the entirety of the crane user fees collected available to Dade County upon demand. *See Phillips v. Washington Legal Found.,* 524 U.S. 156, 118 S. Ct. 1925, 1930 (1998) (describing a characteristic of IOLTA trust account). The Operating Agreement had no provision entitling the County to the interest earned on the crane user fees in Fiscal Operations' bank account. *Id.* at 1931 (collecting cases that uniformly adhere to the rule that "interest follows principal" — i.e., "interest earned belongs to the owner of the funds that

_____

[10] Given the language in the 1982 Contract creating a trust for the benefit of Fiscal Operations of all users fees in excess of the annual budget, the intentional omission of such language from the Operating Agreement is proof of the parties' intent that no trust relationship be created.

[11] Paragraph 13 states that "the Operating Company shall *retain* from User Fees, the Management Fee," and "shall...*pay* to the County any and all User Fees in excess of the amounts retained by the Operating Company as provided in this Agreement, such payment to be made in the manner outlined in written instructions to the Operating Company from the County."

[12] James Williams and Anne Lee testified that, in their *opinion*, the crane user fees belonged to Dade County.

generated the interest"). Fiscal Operations' holding of crane user fees in its own private account was not subject to any of the usual characteristics of a trust. In fact, it would have been impracticable, in the context of this relationship, for Fiscal Operations to hold the crane user fees in trust because Fiscal Operations was required to pay from crane user fees all of the operational expenses associated with maintaining the gantry cranes. Fiscal Operations was required to "pay" to Dade County an amount which depended upon revenues exceeding the agreed upon Management Fee and Excess Usage Fee -- a contingent residual interest whose materialization, and in what amount, could not be predicted with certainty nor even calculated until after the conclusion of the fiscal year.[13]

Hypothetically, the County could not successfully petition a bankruptcy court for release of any such funds from the estate if Fiscal Operations became a debtor in bankruptcy because it would not be able to point to any specific funds in which it had an equitable interest that were held by Fiscal Operation pursuant to a trust. The County instead would be dealt with as a creditor in bankruptcy with any funds due under the Agreement construed as a debt. *See, e.g., Bankers Life and Cas. Co. v. Gaines Constr. Co.*, 199 So. 2d 482 (Fla. 3d DCA 1967) (noting that where the parties fail to establish a trust agreement, a debtor-creditor relationship is formed). This was a debtor-creditor relationship.

Under certain circumstances in the civil context, in the absence of intent to create a trust, a court may impose a constructive trust over funds. However, the alleged misuse of funds upon which a constructive trust could be imposed cannot form the basis for a charge

---

[13] Such a calculation was even more difficult because accounts receivable were often 90 or more days in arrears.

of theft or embezzlement. *See United States v. Holzer,* 840 F.2d 1343, 1348 (7th Cir. 1988) (We know of no criminal prosecutions based on the theory that the constructive trustee is a thief.); *People v. Yannett,* 401 N.E.2d 410, 413 (N.Y. 1980). This is so because the possible beneficiaries of a potential constructive trust simply do not have the requisite pre-existing interest, superior to that of the legal owner of those funds, which is necessary to support a larceny conviction of that legal owner. *Yannett,* 401 N.E.2d at 413.

Thus, with only a "very limited" number of exceptions, courts have "uniformly required a contract irrevocably obligating the debtor both to segregate the 'trust funds' from the debtor's own funds and to deliver the 'trust funds' to the creditor. The exceptions occur only when the "trust is imposed by virtue of a state statute." *Auto-Train Corp., Icn. v. Midland-Ross Corp.*, 810 F.2d 270, 274 (D.C. Cir. 1987). Such is the case, for example, with respect to the failure of a retailer to remit sales taxes to the taxing authority, and, in particular, gasoline taxes.

The case of *State v. Cash,* 628 So. 2d 1100 (Fla. 1993), cited by the Court as potentially relevant, falls into the latter category and is, thus, inapposite to this case. In *Cash,* the Supreme Court of Florida held that a retailer who collects a statutorily-imposed sales tax from consumers acts as a mere "conduit between the consumer and the State," *id.* at 1101, with the retailer required to remit to the State the ***full amount*** of the sales tax collected, that amount computed at the time of the sale. Moreover, by state statute, the State is unambiguously the owner of the sales tax from the moment of the sale.

> Funds collected from a purchaser under the representation that they are taxes provided for under the state revenue laws ***are state funds from the moment of collection*** and are not subject to refund absent proof that such funds have been

refunded previously to the purchaser.

Fla. Stat. §213.756 (emphasis added).[14]

By contrast, nothing in the Operating Agreement expressly states that the crane user fees are county funds *from the moment of collection.* Fiscal Operations was never required to remit to Dade County the full amount of the crane user fees collected; indeed, the amount that Fiscal Operations owed Dade County under the contract was constantly fluctuating.

Equally significant, as the State statutory scheme makes clear, the sales tax is on the ultimate retail consumer. *Id.* at 1101 (*quoting* Fla. Stat. §212.62(2)(a)) (repealed); *see also* Fla. Stat. §212.07(1)(a). The tax, set at a specified rate, is money owed by the retail consumer to the State, whether or not it is collected by the retailer. *Davis v. Ponte Vedra Club*, 78 So. 2d 858 (Fla. 1955). The amount of the sales tax is clearly understood at the time the consumer purchases the merchandise. By contrast, the stevedore companies had no obligation to pay Dade County for gantry crane usage. There being no privity of contract between the stevedore companies and Dade County, the stevedore companies did not owe any gantry crane rental fees to Dade County but solely to Fiscal Operations.

Mr. Grigsby's interpretation of the Operating Agreement -- which creates no ownership interest on behalf of Dade County in the crane user fees -- does not render the "as agent of the County" language in paragraph 13 superfluous. There is no question that Dade County had a residual interest -- as a contingent creditor, not an owner -- in the crane user

---

[14] This special treatment applied to sales taxes and, in particular, gasoline taxes, is uniformly recognized. The American Law Reports have distinct annotations for larceny and embezzlement relating to retailers' failure to pay sales taxes and gasoline taxes. *See, e.g.*, 8 A.L.R. 4th 1068 (1996).

fees to the extent that they exceeded the amounts Fiscal Operations was permitted to retain under the Operating Agreement. Dade County sought to protect that interest by requiring Fiscal Operations to act "as agent of the County" for collection of the user fees in a commercially reasonable manner. Because the contingency of the County's residual interest as a creditor would materialize only after sufficient revenues were collected to exceed an amount not less than the annual budget, this provision contractually obligated Fiscal Operations to continue collecting user fees even after it had collected its Management Fee. In that manner, the County could assure that it had a contractual remedy against Fiscal Operations if Fiscal Operations chose to cease collection efforts once it had collected an amount sufficient to cover the Management Fee.

In sum, the government has failed to prove that Dade County owned the crane user fees. Accordingly, Mr. Grigsby is entitled to a judgment of acquittal on all counts.

**C.  The Course Of Dealings And Conduct Of The Parties Proves That, Under The Contract, Fiscal Operations Owned The Crane User Fees**

The course of dealings of the parties in this case is irrelevant to the issue of "ownership" of the crane user fees because the Operating Agreement unambiguously creates an ownership interest on behalf of Fiscal Operations. Under principles of contract construction, "the conduct of the parties through their course of dealings shall be considered to determine the meaning of the written agreement where the terms are in doubt." *Heuser v. Sunbelt Enters., Inc.*, 537 So. 2d 1071, 1074 (Fla. 1st DCA 1989); *Ace Elec. Supply Co. v. Terra Nova Elec., Inc.*, 288 So. 2d 544, 547-48 (Fla. 1st DCA 1973) (course of dealings is relevant to determine parties' intent where latent ambiguity exists in contract).

Ambiguities may be resolved by taking into account a course of dealings. *Hepler v. Atlas Mutual Ins. Co.*, 501 So. 2d 681 (Fla. 1st DCA 1987). However, the parties' course of conduct is not relevant to determining the intent of the parties where a contract is unambiguous. *Original Appalachian Artworks, Inc. v. S. Diamond Assocs., Inc.*, 44 F.3d 925, 930 (11th Cir. 1995).

"Under some circumstances, a written agreement may be modified by a course of dealings; however, when a course of dealings and the express terms of an agreement appear to conflict, the practice of the parties and the agreement must be construed, wherever reasonable, as consistent with each other." *Flagship Nat'l Bank v. Gray Distrib. Sys., Inc.*, 485 So. 2d 1336, 1340 (Fla. 3d DCA 1986); *see also Kiwanis Club of Little Havana, Inc. v. de Kalafe*, 723 So. 2d 838, 841 (Fla. 3d DCA 1998). Where a policy established by a course of dealings cannot be construed in a consistent manner with the express provision of a contract, the express provision must control. *Cox v. CSX Int., Inc.*, No. 96-4514, 1999 WL 9764, *3 (Fla. 1st DCA Jan. 13, 1999).

To the extent that this Court determines that the course of dealings is relevant, that course of dealings must be construed in a manner consistent with the Operating Agreement and relevant law. The only course of dealings arguably relevant to the issue of "ownership" of the crane user fees is the manner in which the crane user fees were held by Fiscal Operations, notwithstanding Anne Lee's "expert" opinion to the contrary. There is simply no legal authority for the proposition that factors such as risk, control of the tariff, control over the budget, and the like, affect the ownership of money in a private bank account.

Beginning in 1982, prior to the County's purchase of the cranes, Fiscal Operations

deposited all crane user fees in its own bank account, first in Miami and then in San Francisco, and reported those gross crane user fees on its federal tax returns and financial statements. That practice did not change upon the County's purchase of the two cranes in 1988, or upon the installation of new cranes. Fiscal Operations, with the County's knowledge and consent, deposited in its own bank account the crane user fees from all ten cranes regardless of whether owned by Heller, the County or one of the Fiscal companies. Fiscal Operations commingled those user fees with funds from other sources. Fiscal Operations' bank account was not a segregated trust account for Dade County. Nor was it a county depository. No county official had signatory authority over the Fiscal Operations bank account. The Port of Miami periodically sent invoices to Fiscal Operations for amounts due under the contract, and threatened to charge interest for any late payments. *See Travel Committee, Inc. v. Pan American World Airways, Inc.*, 603 A.2d 1301, 1322 (Md. 1992) ("We find this controlling and conclude, therefore, that TCI's obligation to pay interest for late payments reflects its status as a debtor and not a fiduciary.").

In sum, the course of dealings between the parties over the course of fifteen years was constant in the manner in which the crane user fees were held, and consistent with Mr. Grigsby' interpretation of the Operating Agreement. The relationship between Fiscal Operations and Dade County was one of debtor/creditor. Accordingly, even if the course of dealings is relevant, Mr. Grigsby is entitled to a judgment of acquittal on all counts.

### D.   An Ambiguous Contract Cannot Form The Basis For A Criminal Prosecution

The government has unmistakably taken the position that the Operating Agreement

is ambiguous on several fronts.  First, according to the government, it is "ambiguous and contradictory" regarding whether Fiscal Operations is an "agent" of Dade County because of the conflict between paragraphs 5 and 13.  Tr. 4/28/99, at 132.  Second, the government claims it is ambiguous regarding how much money Fiscal Operations was entitled to retain in a given year -- i.e., whether it was simply a "management fee" of $100,000 to $150,000, or the entire budget.  Tr. 4/28/99, at 133.  Third, the Operating Agreement is allegedly ambiguous regarding the type of "promotional" expenditures that Fiscal Operations was entitled to make.  Tr. 4/28.99, at 154-55.  In effect, the government concedes that there is a reasonable construction of the Operating Agreement that supports Mr. Grigsby's claim that Fiscal Operations owned the crane user fees and was entitled to spend the money in its own bank account as it saw fit.

The Court appears to have accepted the government's argument that the Operating Agreement is ambiguous regarding the ownership issue.  The Court permitted government witness Anne Lee to render an "expert" opinion that the course of dealings made Dade County the "owner" of the crane user fees, and that she did not even need to rely on the Operating Agreement.  As explained in Section C, *supra*, that "course of dealings" is irrelevant to the question of ownership unless the Operating Agreement is ambiguous.  In fact, Mr. Grigsby moved to strike the testimony of Anne Lee on this ground.  The Court denied the motion, implicitly concluding that the Operating Agreement is ambiguous on the ownership issue.

The government's explicit position, and the Court's implicit acceptance of that position, means that the defendants are not guilty as a matter of law.  In *United States v.*

*Race*, 632 F.2d 1114 (4ᵗʰ Cir. 1980), the defendants were the owners of an engineering firm that had a contract to supply labor and services to the Navy. They were convicted of submitting false and fraudulent invoices in amounts in excess of the amounts allowable under the contract. *Id.* at 1116. The Fourth Circuit reversed the convictions, concluding that the contract "very clearly authorized" the defendants to bill the Navy for the amounts actually billed. *Id.* at 1119. The Court rejected the government's alternative argument that the contract was ambiguous, and wrote:

> Even if we were to accept the Government's argument that the per diem clause is ambiguous, which would be the best that could be said for the Government's argument, the result would not be different. To be ambiguous a contract must be susceptible of at least two reasonable constructions. When the Government concedes that the clause is ambiguous, it necessarily concedes that the defendants' construction of the per diem clause, which is one of the constructions, is reasonable. Such a conclusion requires a ruling that the defendants cannot be convicted under section 1001 for a statement or billing which may be said to be accurate within a reasonable construction of the contract. This is so because one cannot be found guilty of a false statement under a contract beyond a reasonable doubt when his statement is within a reasonable construction of the contract.

*Id.* at 1120. The same result is required here. The government's concession that the Operating Agreement is ambiguous on issues of agency and ownership of the crane user fees means that no reasonable jury could find, beyond a ***reasonable doubt***, that the crane user fees were owned by Dade County, that Mr. Grigsby so believed, and that Mr. Grigsby intended to steal money owned by Dade County. Accordingly, Mr. Grigsby is entitled to a judgment of acquittal on all counts.

### E.   Calvin Grigsby's Honest Belief That Fiscal Operations Owned The Crane User Fees Is A Complete Defense

Even assuming that the crane user fees were legally owned by Dade County, Mr.

Grigsby cannot be guilty of violating 18 U.S.C. §666 because the government failed to prove that Mr. Grigsby believed that the crane user fees were actually owned by Dade County and that he was not entitled to make the charged expenditures from Fiscal Operations' bank account. *Morissette v. United States*, 342 U.S. 246, 270-72 (1952) (holding that intent element of 18 U.S.C. §641 requires knowledge that the property is owned by federal government). Under Florida law, "there is no doubt" that a defendant's honest belief in his right to certain property "negates the specific intent which is an indispensable element of the crimes of larceny and, now, theft." *Rodriguez v. State*, 396 So. 2d 798, 799 (Fla. 3d DCA 1981). In *Rodriguez*, the defendants were employed as managers of a motel in Marathon. They failed to remit to the owner the entire proceeds of three room rentals in March 1978 on the ground that they believed that the money was rightfully theirs under a compensation agreement with their employer. *Id.* at 798-99. After they were convicted of theft, the Third District Court of Appeal reversed because the trial court failed to instruct the jury that a defendant's honest belief in his entitlement to property was a complete defense to the charge of theft. *Id.* at 799; *see also Philippoussi v. State*, 691 So. 2d 511 (Fla. 4th DCA 1997) (same). The appellate court further observed that "a controversy such as this seems more appropriately the subject of a civil action than a criminal prosecution." *Rodriguez*, 396 So. 2d at 800 n.7.

The government advances a four-step inductive reasoning process to establish that Mr. Grigsby intended to steal County funds: 1) paragraph 13 says that Fiscal Operations is a collection agent; 2) a collection agent is necessarily a trustee (a flawed assumption, as explained above); 3) a trustee has a duty not to waste the trust estate; and 4) the waste

constitutes a §666 theft. Such an abstract analysis cannot be countenanced where the crime requires specific intent unless the government can prove Mr. Grigsby engaged in this same reasoning process.

Here, no reasonable jury could find beyond a reasonable doubt that Mr. Grigsby honestly believed that the crane user fees were "owned" by Dade County or that the Fiscal Operations bank account was a trust account for Dade County. Mr. Grigsby hired three sets of accountants to review all expenses -- in-house, tax accountants, and outside auditors -- none of whom advised Mr. Grigsby of any serious accounting concerns, much less criminal theft concerns. Mr. Grigsby signed every tax return of Fiscal Funding in which he declared the gross revenue from crane user fees as income to Fiscal Operations, and in which he reported no funds of Fiscal Operations held in trust for anyone. Mr. Grigsby reported the crane user fees on the financial statements. Mr. Grigsby knew that no County official had signatory authority on the bank account.

Similarly, no reasonable jury could find beyond a reasonable doubt that Mr. Grigsby believed he was not permitted to make the charged expenditures from funds on deposit in Fiscal Operations' private bank account. Mr. Grigsby openly wrote checks on Fiscal Operations' bank account to entities that did not relate to the operation of the cranes. Mr. Grigsby allowed political contributions to be written on Fiscal Operations checks, all of which were reviewed by the three sets of accountants. Where, as here, the alleged "taking" is done openly — i.e., with documentation — there is a "strong presumption" of a lack of felonious intent. *Id.* at 799 n.3.

Moreover, Mr. Grigsby knew that Mr. Tiddes was keeping a diary and periodically

encouraged Mr. Tiddes and Mr. Darden to make notations in the diary about certain events, and never told them to keep anything out of the diary. Tr. 5/5/99, at 17-18; Tr. 5/21/99, at 95. There is no evidence that Mr. Grigsby directed any of his employees, accountants, or auditors to falsify entries, destroy documents, or mischaracterize expenditures for the purpose of deceiving Dade County. Tr. 5/19/99, at 182-87, 200. To be sure, government witness James Williams testified that he did not "know of anything that Mr. Grigsby did that was illegal or improper relating to Fiscal Operations." Tr. 5/11/99, at 201.

In sum, the government presented insufficient evidence that Mr. Grigsby possessed felonious intent. Accordingly, he is entitled to a judgment of acquittal on all counts.

### F. Both The County's Authorization Of The Operating Agreement And Its Consent To Fiscal Operations' Budget And Expenditures Are Complete Defenses

Moreover, even assuming that Dade County was the legal owner of the crane user fees -- an assumption we dispute -- Mr. Grigsby is not guilty of theft because the allegedly "unauthorized expenditures" that form the basis for the charges were in fact authorized by Dade County. Consent by the owner, or an authorized representative of the owner, to the taking of property is a complete defense to the charges of theft, embezzlement, misapplication, and conversion. *Bowles v. State*, 14 So. 2d 269, 270 (Fla. 1943); *Brennan v. State*, 651 So. 2d 244, 245 (Fla. 3d DCA 1995); *Quarterman v. State*, 401 So. 2d 1159, 1159 (Fla. 3d DCA 1981). Moreover, a party's good faith belief that an authorized representative of the owner had approved a particular "taking" is a complete defense. *Gill v. State*, 670 S.W.2d 758 (Tex. Ct. App. 1984). The burden of proving lack of consent is on the government. Here, the government failed to prove that the County did not consent to the

"unauthorized expenditures" by Fiscal Operations.

There is no dispute that Fiscal Operations was lawfully in possession of the crane user

fees.  The Dade County Board of County Commissioners, represented by the County

Attorney, approved a contract, with no express trust provisions, which clearly authorized

Fiscal Operations to retain the crane user fees.  Nor is there any dispute that Fiscal

Operations was permitted, indeed required, under the Operating Agreement to make

expenditures from the crane user fees it collected.  Moreover, no provision of the Operating

Agreement specified the type of expenditures that were permissible or impermissible, nor did

any provision of the Operating Agreement require Fiscal Operations to obtain approval from

the County for individual expenses on an expense-by-expense basis.  The required form of

the Annual Budget contemplated round numbers in seven categories, not itemized, with no

requirement of specificity.  The term "Annual Budget" is defined in paragraph 5 and used in

only two places in the Operating Agreement: (1) to calculate the Management Fee; and (2)

to calculate the Excess Usage Fee.   There is no provision which makes the Annual Budget

operative to control or authorize the "type" or "quality" of expenses.  Finally, it is beyond

dispute that Mr. Lunetta, as Port Director, was the only County Representative designated

by the County Commission to approve Fiscal Operations' budget. The government presented

no evidence that Mr. Lunetta did not have the complete authority of the County Commission

to approve the budget of Fiscal Operations.

Mr. Grigsby cannot be guilty of theft for making expenditures under an Operating

Agreement that did not clearly prohibit such expenditures. *See United States v. Porter*, 591

F.2d 1048, 1057 (5th Cir. 1979) (reversing convictions and noting the absence of any statute

or regulation which prohibited defendants from charging and receiving "handling fees" from Medicare for drawing and handling blood samples). Far from being "unauthorized," however, the expenditures were expressly authorized by Dade County.

The evidence established that Mr. Lunetta, as the authorized County Representative, approved the budget for all relevant years. An amount not less than the annual budget was the "Management Fee" to which Fiscal Operations was entitled. All of the so-called "unauthorized expenditures" by Mr. Grigsby were made within the contours of the approved budget and, therefore, were approved by Mr. Lunetta. If a particular expenditure threatened to exceed the budget, Fiscal Operations would obtain the approval of Mr. Lunetta, as County Representative, for an amendment of the budget. Other expenditures were directed, and thereby approved, by Mr. Lunetta. Accordingly, Mr. Grigsby had consent for all expenditures and is not guilty as a matter of law.

### G. The Management Fee Constitutes A "Bona Fide" Fee In The Usual Course Of Business Under 18 U.S.C. §666(c)

18 U.S.C. §666(c) provides an exemption from the coverage of the statute for "bona fide salary, wages, *fees, or other compensation paid*, or expenses paid or reimbursed, in the usual course of business." (Emphasis added). That section was added to the statute in 1986 to avoid "possible application to acceptable commercial and business practices" and not "constrain lawful commercial business transactions." *United States v. Rooney*, 37 F.3d 847, 854 (2d Cir. 1994). Section 666(c) covers *compensation paid* (a "fixed price contract" theory) or *expenses paid or reimbursed* (a "cost-plus contract" theory). Although Mr. Grigsby submits that the Operating Agreement is an unambiguous "fixed-price contract,"

§666(c) exempts either form of contract.

The cases that have considered subsection (c) have been uniform in their treatment of its applicability. Courts have routinely invalidated §666 prosecutions aimed at policing or auditing salaries or fees paid in connection with employment or business transactions of local governments and private entities. In fact, it has made no difference to the courts how the compensation was obtained, whether it be in violation of state law, *see United States v. Mann*, No. 97-6179, 1999 WL 17647 (6th Cir. Jan. 4, 1999) (unpublished disposition) (dismissing §666 theft prosecution against a vocational school principal who retained his principal's salary despite his lack of certification to hold the position under Kentucky law because principal legitimately performed the necessary duties of his job and was paid in the usual course of business), through bribery, *see United States v. Mills*, 140 F.3d 630 (6th Cir. 1998) (dismissing §666 charges against individuals who bribed higher-ups in the Memphis Sheriff's Office in order to obtain deputy sheriff's jobs because of absence of allegation that jobs in question were unnecessary or that the individuals who obtained those employment positions did not responsibly fulfill the duties associated with their employment), or via false records. *United States v. Harloff*, 815 F. Supp. 618 (W.D.N.Y. 1993) (dismissing §666 theft charge against defendants who inflated their compensation by falsifying their payroll records claiming to work forty-hour weeks but actually working fewer hours); *see also United States v. Valentine*, 63 F.3d 459, 465 (6th Cir. 1995) (approving, but distinguishing, *Harloff* because defendant stole the time of other employees). So long as the employee or contractor performed his duties, the amount of compensation or the manner in which the compensation was obtained is outside the purview of §666.

In this case, the government has presented no evidence that Fiscal Operations failed to perform necessary duties under the Operating Agreement. To the contrary, the evidence established that Fiscal Operations ran one of the most efficient gantry crane operations in the United States. Rather, the government's complaint appears to be with the **amount** of the budget, i.e., the management fee, which Fiscal Operations was permitted to retain, in view of the non-crane related expenditures. This is precisely the type of micromanagement and interference with legitimate commercial relationships that Congress sought to avoid when it amended §666.

The interrelation of the legal issues in this case with complicated issues of contract interpretation, state law and state sovereignty, illustrate why Congress sought to remove from the federal government the power to act as a general policeman with regard to fees paid in connection with a legitimate contractual relationship. The federal government has no business imposing its view of an appropriate management fee on two parties to a contract, and basing a federal prosecution on its disagreement with the view of the parties. An appropriate management fee is the amount that the parties agree upon. Fiscal Operations, through Mr. Grigsby, developed the idea for underwriting the initial purchase of two cranes in 1982 and, by all accounts, saved Dade County $2.5 million. Through Fiscal Operations, Mr. Grigsby assumed the risk attendant to a debt in excess of $24 million from operating advances that had accrued since 1982. Mr. Grigsby, through Fiscal Operations, assumed the risk that expenses would exceed revenues in post-1988 years, resulting in a loss to his company. Mr. Grigsby, through Fiscal Operations, assumed the risk of a personal injury on the crane site that would bankrupt his company. Mr. Grigsby, through Fiscal Operations

operated one of the most efficient crane operations in the United States, which helped attract

substantial business to the Port of Miami and Dade County.  Given these facts, if Mr.

Grigsby had persuaded Carmen Lunetta, as County representative with full authority to

approve the budget, to allow Fiscal Operations to annually retain $10 million, which included

a $1 million expense for the San Francisco allocation and $1 million as a management fee

paid to Fiscal Funding, the federal government would have no business in questioning Fiscal

Operations' entitlement to those fees or Mr. Lunetta's authority to approve those fees.  Fiscal

Operations performed a bona fide service at the Port of Miami.  The amount that Fiscal

Operations was permitted to retain to provide that service under the Operating Agreement,

even if it seems unreasonable, is not the basis for a prosecution under §666(c).[15]

Accordingly, Mr. Grigsby is entitled to judgment of acquittal as a matter of law.

**H.     There Is No Federal Jurisdiction**

The obvious source of constitutional authority for §666 is the Spending Clause, which

empowers Congress to "pay the Debts and provide for the common Defence and general

Welfare of the United States." U.S. Const. art. I, §8; *see United States v. McCormack*, 31 F.

Supp. 2d 176, 187 (D. Mass. 1998).  All powers not expressly delegated to Congress "are

reserved to the States, respectively, or to the people." U.S. Const. amend. X.  Congress'

---

[15] The evidence pertaining to employees who were paid by, but did no work for, Fiscal Operations is irrelevant to this analysis for several reasons. First, none of the "ghost employee" transactions is charged in the Superseding Indictment. Second, the evidence established that these employees actually did work for Dade County. Third, there is no evidence that Mr. Grigsby knew that any employees were doing no work for either Fiscal Operations or Dade County. Fourth, the "management fee" retained by Fiscal Operations was for operating the project. Thus, the issue applicable here is wether Fiscal Operations operated the gantry cranes as required under the Operating Agreement, not whether there was unnecessary labor.

spending power is not broad enough to permit federal regulation through the criminal law of wholly local conduct unrelated to the administration of federal funds or the integrity of a federal program. *McCormack, supra.*  When Congress attempts to regulate conduct, under a general police power, in an area where "the States possess primary authority," the congressional action violates the principles of federalism embodied in the Constitution. *See, e.g., United States v. Lopez*, 514 U.S. 549 (1995).

In the context of the Spending Clause, Congress is no doubt constitutionally permitted to protect the administration of federal funds it provides to local community organizations by authorizing federal prosecution for misappropriations of those funds when they are commingled with local funds or by criminalizing theft or bribery that affects the integrity of a federal program.  Congress, however, is not free to authorize the prosecution of any conduct that does not, in any way, affect or relate to the administration of federal funds, or local funds commingled with federal funds, or the integrity of a federal program.  Thus, the relevant question is whether 18 U.S.C. §666 reaches the conduct alleged and, if so, whether it is unconstitutional as applied to this case.

### 1.    *18 U.S.C. §666 Does Not Reach The Conduct Alleged In This Case*

At the outset, it is important to note that in cases where federal courts confront the possibility that an Act of Congress is at odds with the Constitution, it should construe any statutory ambiguity to avoid the potential constitutional conflict. *Ashwander v. T.V.A.*, 297 U.S. 288 (1936).  This doctrine is particularly important in federalism cases, in which the Supreme Court recently has required Congress to clearly state, in the text of a statute, whether it intends a law to regulate areas within the control of the states. *See Gregory v.*

*Ashcroft*, 501 U.S. 452 (1991). Thus, 18 U.S.C. §666 should be interpreted in a manner, if reasonable, that permits the Court to avoid reaching the question of whether it is unconstitutional as applied.

*Ashcroft* is particularly instructive here. In that case, Congress used its Commerce Clause powers under the Fair Labor Standards Act to regulate the working conditions of state and local government employees. State judges claimed that they were subject to the law's prohibition on mandatory retirement ages, but the Supreme Court refused to read the statute to include state judges, because to do so would have raised a difficult constitutional question - whether Congress can interfere with state regulation of its own employees. The Court declared that if Congress wanted to use its Commerce Clause powers in this manner, it would have to clearly say so in the statute.

A similar question is at issue here. The government is using §666 to criminalize expenditures made pursuant to a contractual relationship between a private company and a local government. The government has yet to identify how a dispute between two parties over what expenditures are authorized or unauthorized under a contract is a matter of federal concern. This Court need not decide the difficult question whether Congress has the constitutional authority to intrude into private contractual relationships in this way, because the statute does not clearly evidence Congress's intent to reach conduct that is unrelated in any manner to the administration of federal funds or a federal program. The Supreme Court in *Salinas v. United States*, 522 U.S. 52 (1997), did not employ the *Ashwander/Ashcroft* doctrine, because the statute did not come into potential conflict with the Constitution in that case: the facts clearly showed that the illegal conduct impacted on the integrity of a federal

program.   Indeed, the Court studiously avoided deciding whether §666 would be constitutional under any other fact pattern.  This case presents precisely such a fact pattern, and this Court should read §666 as not reaching conduct that does not in any way affect -- or have the capacity to affect -- the integrity of a federal program, unless Congress were clearly to so require.  *See United States v. Santopietro*, 166 F.3d 88, 93 (2d Cir. 1999) (observing that §666 would not criminalize "a bribe paid to a city's meat inspector in connection with a substantial transaction just because the city's parks department had received a federal grant of $10,000."); *United States v. Frega*, 933 F. Supp. 1536 (S.D.Cal. 1996).  By adopting this approach, this Court can avoid having to reach the difficult constitutional questions posed by §666.

It is important to make clear what Mr. Grigsby is *not* arguing.  Mr. Grigsby does *not* contend that 18 U.S.C. §666 requires the government to trace the alleged theft to the federal funds provided to Dade County under a federal program.  Plainly, if the government could trace the theft in that manner, §666 would be superfluous because 18 U.S.C. §641 already criminalizes theft of federal property.  However, whereas the theft of property under §666 need not directly affect federal funds, there must be a *threat* to the administration of those funds, the funds with which they have been commingled, or to the integrity of the federal program under which the federal funds have been provided.  *Salinas v. United States*, 522 U.S. 52 (1997).  Otherwise, §666 would be the exercise of a general police power, giving the federal government the power to criminalize virtually any act of corruption involving a local government, whether or not related in any way to the federal program or the administration of federal funds.

The government failed to present evidence of a specific federal program that was threatened by Mr. Grigsby's alleged conduct. Thus, no matter how loosely the constitutional requirement of a threat to the integrity and proper operation of a federally funded program is read, that requirement is not met here. The handling of the gantry cranes, and the receipt of payments from the stevedore companies, is a purely local commercial transaction and bears no nexus to any alleged federal program. The allegedly stolen user fees came from private commercial actors (stevedores) who were paying another private commercial actor (Fiscal Operations) that had a franchise from the County to operate the cranes. Dade County itself was acting as a commercial entity, contracting with Fiscal Operations to operate the cranes and receiving money pursuant to a contractual formula. "There is no indication in the history of section 666 that Congress intended federal law enforcement agencies to plice the financial affairs of private entities that do not administer federal funds." *United States v. Wyncoop*, 11 F.3d 119, 122 (9th Cir. 1993).

The user fees that were allegedly stolen were collected and held on deposit in the bank accounts of Fiscal Operations. Those user fees had no nexus to the receipt of federal funds because they were received from private entities. There is no allegation that the user fees received from the stevedores were commingled with federal program funds before any alleged theft or that they were part of a federal program. So here, the intent of Congress to protect federal funds even if title has passed to the recipient and has been commingled, *see* S. Rep. No. 98-225, at 369 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3511, has no application. Although a portion of the user fees were ultimately paid to the Seaport fund, no money from the Seaport passed to Fiscal Operations. Finally, there is no evidence that Mr. Grigsby had

any role in the administration of federal funds, federal funds commingled with local funds, or a federal program, either directly or indirectly, in his role as Chief Executive Officer of Fiscal Operations.. The conduct alleged is outside the scope of §666.

### 2.    *If 18 U.S.C. §666 Is Interpreted To Reach The Conduct Alleged In This Case, It Is Unconstitutional As Applied*

In *Salinas*, the Supreme Court suggested that there are constitutional constraints on the reach of §666, without spelling out the exact scope of those limits. Although the Court held that §666 is "not confined to a business or transaction which affects federal funds," the Court observed:

> Furthermore, there is no serious doubt about the constitutionality of §666(a)(1)(B) as applied to the facts of this case. Beltran was without question a prisoner held in a jail managed pursuant to a series of agreements with the Federal Government. The preferential treatment accorded to him was *a threat to the integrity and proper operation of the federal program.*

*Salinas*, 118 S. Ct. at 473, 475 (emphasis added). As the magistrate judge acknowledged in his pretrial Report and Recommendation, "after *Salinas*, in order to violate §666(a)(1)(B), a bribe need not be in connection with a business or transaction which 'affects' federal funds, but there still must be a threat to the integrity and proper operation of a federally funded program." Report at 8. We agree. That principle, as applied to this case, mandates dismissal of the Superseding Indictment for lack of subject matter jurisdiction.

Although on its face broadly termed, the Supreme Court in *South Dakota v. Dole*, 483 U.S. 203 (1987), recognized that Congress' power under the Spending Clause is not unlimited. Specifically, the *Dole* Court specified four requirements to be met before a congressional exercise of power under the Spending Clause could be upheld:

-62-

(1) The spending power must be used in pursuit of general welfare;

(2) Congress must state any conditions unambiguously;

(3) Conditions must be related to the federal interest in particular national projects or programs; and

(4) Conditions must not violate other independent constitutional restrictions on government activity.

*Id.* at 207-08.  In the instant case, the evidence failed to satisfy the third prong -- the relatedness requirement -- because there is no nexus whatsoever between the alleged "unauthorized expenditures" and a federal program.  Accordingly, permitting §666 to reach the conduct alleged here would mean that §666 is an unconstitutional exercise of congressional power under the Spending Clause, thus violating the Tenth Amendment.

Few courts have dealt with the meaning of the language in *Salinas* regarding the constitutional application of §666.  Most significantly in *United States v. Santopietro*, 166 F.3d 88, 93 (2d Cir. 1999), the court, quoting this exact language, held that a constitutional application of §666 requires a threat to the integrity and proper operation of a federal program.  The court found the requisite threat satisfied there where bribes were paid by real estate developers to city officials.  *Id.*  Those officials worked for agencies which administered federal funds for housing and urban development.  *Id.*  In contrast, the court reasoned by example that §666 would not cover "a bribe paid to a city's meat inspector in connection with a substantial transaction just because the city's parks department had received a federal grant of $10,000."  *Id.*

Likewise, in *United States v. McCormack*, 31 F. Supp. 2d 176 (D.Mass. 1998), the court dismissed an indictment after finding the charged conduct had an insufficient federal

nexus.  There, the defendant was charged with violating §666 by bribing a local police

officer not to investigate certain state crimes.  The court noted that "while *Salinas* did not

involve the manipulation of federal monies, it did involve the conduct of a federal program."

*Id.* at 186.  Thus, the court held that §666 did require that the illicit conduct must have "at

least *some nexus* with the federal funds or programs."  *Id.* at 189 (emphasis added).  The

court acknowledged that the local police department did receive at least $10,000 in federal

funds per year, but rejected the government's suggestion that this alone was sufficient to

prosecute any bribery of police officials:

> As every state is likely to receive at least $10,000 in federal funding, any
> corrupt act committed by a state agent anywhere within its borders, somehow
> meeting the $5,000 value requirement, could now fall within the jurisdiction
> of the federal authorities, even if there were no connection to federal funds.

*Id.* at 186 (footnote omitted).  *Salinas* means that a constitutional application of §666 requires

some nexus between the charged conduct and the administration of a federal program.

In his pretrial ruling, the magistrate judge rejected this interpretation of *Salinas* and

instead concluded from dicta in *United States v. Fischer*, 168 F.3d 1273 (11th Cir. 1999), that

the Eleventh Circuit adheres to a broader reading of §666.  *Fischer*, however, did not

consider the constitutional limitation of §666.  Rather, the court held that Medicare payments

to the hospital authority qualified as "benefits" under §666(b).  The *Fischer* court based its

decision "entirely on the plain language of §666(b)" and then went on to consider the

legislative history of §666 because of the ambiguousness of the statute.  *Id.* at 1277.  Thus,

it is error to read dicta from footnote 8 in the *Fischer* opinion as a holding concerning a

constitutional challenge to §666.  Footnote 8 relies on *United States v. Paradies*, 98 F.3d

1266 (11th Cir. 1996), a case, decided before *Salinas,* which did not address the constitutionality of the statute as applied in that case. Simply put, *Salinas'* constitutional limitation requiring a threat to the integrity and proper operation of a federal program has never been addressed by the Eleventh Circuit.

Section 666, as applied here, cannot be justified under Congress's Spending Clause power. Congress can impose conditions that normally might rest outside Congress's other enumerated powers, so long as they are attached to the receipt of federal funds. Section 666, however, is not even expressed as a condition on a federal grant program, as required by *South Dakota v. Dole, supra.* The government has not identified what federal program is even at issue here, and what federal interest at stake is threatened, and hence in need of the §666 condition. Even if there were some federal program identified by the government (as with the federal incarceration program at issue in *Salinas*), there has been no showing of any nexus between the anti-fraud and misuse provisions of §666 and the purpose of the program. In *Salinas*, the court found a nexus between the integrity of the program and the funds received to incarcerate federal prisoners. Here, there is no federal program at issue that assists states and localities in contracting for crane operations. The federal government cannot claim that it has a general federal interest in ensuring good government in every state and locality in the nation; no enumerated power in the Constitution gives the national government that power or interest.

Even if the court were to find that §666 rests within Congress's constitutional powers as applied to this case, it still would be an unconstitutional invasion of the reserved powers of the states as guaranteed both by the Tenth Amendment and the federal structure of the

national government. In a series of cases in the last decade, the Supreme Court has identified and protected from federal regulation certain areas of state sovereignty. In *Printz v. United States*, 521 U.S. 989 (1997), the court struck down a federal statute that sought to "commandeer" state executive officials to implement federal goals. In *New York v. United States*, 505 U.S. 144 (1992), the court invalidated a federal program that sought to order states to pass certain legislation. In *Seminole Tribe v. Florida*, 116 S.Ct. 1114 (1996), the court held that Congress could not use its Commerce Clause powers to force states to waive their sovereign immunity. In *City of Boeme v. Flores*, 117 S.Ct. 2157 (1997), the court indicated that Congress could not use its Article 5 powers under the Fourteenth Amendment to force the states to protect individual rights that went beyond the Amendment's requirements. These cases indicate that even if Congress is exercising a valid constitutional power, it cannot do so in a manner that infringes on state sovereignty. This is a separate inquiry from the question whether Congress has an enumerated power that allows it to regulate the conduct in question.

This case involves subjects at the very core of state powers and interests. At heart, this is a case about the contractual relationship between a local government and a private company. As suggested by *Gregory v. Ashcroft*, how the state chooses to regulate the contracts of its municipalities is an area that rests within state sovereignty. States can choose to handle such matters with its criminal laws, with civil ethics laws, or even just through the electoral process. Section 666, if applied here, would amount to federal regulation of the conduct of all state and local officials, ***and private actors***, regardless of whether their activity involved or impacted a federal program. This would appear to be a matter that can best be

-66-

handled by state laws and state courts.  And as suggested by concurring Justices in *Lopez*, the court should be wary of allowing Congress to enter into areas, such as state criminal law and state governmental operations, that have traditionally been the preserve of the states.

## I.      The Due Process Clause And Rule Of Lenity Require Dismissal

An individual may not be convicted of a crime unless he has been given "fair warning ... in language that the common world will understand, of what the law intends to do if a certain line is passed.  To make the warning fair, so far as possible the line should be clear." *McBoyle v. United States*, 283 U.S. 25, 27 (1931).  "'The ... principle is that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." *Bouie v. City of Columbia*, 378 U.S. 347, 351 (1964) *(quoting United States v. Harriss*, 347 U.S. 612, 617 (1954).  "[D]ue process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." *United States v. Lanier*, 520 U.S. 259, 266 (1997).

Even if the Court determines that 18 U.S.C. §666 applies to this case, that application is so novel that neither the statute nor any prior judicial decision fairly disclosed that his conduct as a private independent contractor was covered within its scope.  Given the difficulty and complexity of the issues, Mr. Grigsby should not be held accountable for conduct that he could not have rationally understood to be a violation of law.  Accordingly, the Due Process Clause and the rule of lenity require dismissal of the charges.

## CONCLUSION

For the foregoing reasons, Mr. Grigsby respectfully requests that the Court grant a judgment of acquittal on all substantive counts of the Superseding Indictment charging violations of 18 U.S.C. §666. Because the conspiracy count and the money laundering counts are based on the charged violations of §666, Mr. Grigsby requests a judgment of acquittal on those counts as well.

Respectfully submitted,

Albert J. Krieger, Esq.
(Fla. Bar #209422)
ALBERT J. KRIEGER, P.A.
1899 South Bayshore Drive
Miami, Florida 33133
(305) 854-0050
Fax (305) 285-1761

Theodore V. Wells, Jr., Esq.
LOWENSTEIN, SANDLER, KOHL, et al.
65 Livingston Avenue
Roseland, New Jersey 07068
(973) 992-8700
Fax (973) 992-5820

Scott A. Srebnick, Esq.
(Fla. Bar #872910)
1899 South Bayshore Drive
Miami, FL 33133
(305) 285-9019
Fax (305) 285-1761

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing memorandum was hand-delivered to counsel of record, this 2nd day of June, 1999:

Scott A. Srebnick, Esq.

-68-